PARKS v. BROOKS.

1. TRUSTS—DEEDS—SETTING ASIDE INSTRUMENT—EXECUTORS AND ADMINISTRATORS—FRAUD—FIDUCIARY RELATIONS.

The principal defendant was the administrator *de bonis non* of the will of Polly Robinson, deceased, and his son was one of the heirs and devisees under said testament, of a remainder in testator's farm, subject to a life interest in one of her daughters. Defendant, who was an uncle of complainants and fully trusted by them, administered the estate for many years. The son became subject to ill health and went to a warmer climate, during which time his father advanced to him considerable sums of money. Approaching complainants for the purpose of procuring a release or quitclaim of their interests in the real property mentioned, in his son's favor, defendant falsely represented the nature and effect of the conveyance, in that he stated it was only intended to vest in the son an interest which he would finally have anyway and told the grantors that they would have no interest in the property ultimately. These representations were untrue, and complainants were induced by them and by other misleading representations to sign the paper, which later proved to be a quitclaim deed of their remainder interest. The son died before the life tenant. Defendant administrator survived his son and the life tenant, having procured a deed from the son conveying the realty to himself, and he finally disposed of the premises for $4,500 more than the inventory value. He converted the proceeds to his own use. Complainants claimed the right to an accounting and to follow the funds derived from these transactions as a trust fund. *Held*, that the court of equity would compel defendant administrator to account for the property as for a portion of a trust estate, that the relations between himself and complainants were of a fiduciary nature, and that he was chargeable with the proceeds of the sale for the benefit of complainants.

2. SAME—PRINCIPAL AND AGENT—TRUSTS.

One occupying a position of trust and confidence may not place himself in a situation in which his interest may conflict with his duty.

3. SAME—LACHES—FIDUCIARY RELATIONS.

As the defense of laches rests primarily on the theory that it would be unjust to permit a claim to be enforced by reason of changed conditions or altered situation of the parties resulting from delay, mere lapse of time unaccompanied by any elements of estoppel will not deprive a complaining beneficiary of his remedy against his trustee.

4. SAME—MISTAKE—EQUITY.

As a general rule a mistake of law is no ground for equitable relief, but if the mistake has been induced by false representations of a party, standing in a relation of trust and confidence towards the injured one, the court of equity may interfere to remedy the injustice; or if it appear that a fiduciary perceived or knew of the mistaken view so held, and took advantage of the fact, the court will be more inclined to interpose its remedial powers.[1]

5. SAME—FRAUD—ACCOUNTING.

And equity will require an accounting, if fraud is charged and proved or if fiduciary relations exist.

6. SAME—ACCOUNTING—DISCOVERY.

Chancery courts not only have a general supervisory authority over trustees and strictly trust estates, but have power to correct breaches of trust and fraudulent conduct on the part of all persons that may occupy relations of confidence; and it is not essential that the accounts be mutual or complicated or that the bill be framed for a discovery; nor is the objection that complainant has an adequate remedy at law tenable as a defense to the proceeding.

Appeal from Oakland; Smith, J.   Submitted June 28, 1915.   (Docket No. 68.)   Decided December 21, 1915.

Bill by Edgar A. Parks and others against Eugene Brooks and others to set aside a deed.   From a decree for complainants defendant Brooks appeals.   Affirmed.

[1] Mistake of law as to effect of instrument as a ground for its cancellation is discussed in note in 28 L. R. A. (N. S.) 785.

*Andrew L. Moore* and *Glenn C. Gillespie,* for complainants.

*Aaron Perry* and *John H. Patterson,* for defendant Brooks.

STEERE, J.　This bill is filed by complainants to set aside as to them a quitclaim deed of certain property in Oakland county given, March 9, 1903, by themselves and Austin R. Parks to Francis Eugene Brooks, their cousin, son of defendant Eugene Brooks, on the ground that the same was obtained through fraud and misrepresentation on the part of said Eugene Brooks, and given without any consideration therefor. Complainant Ella J. is wife of Edgar A. Parks.

The property in question was a part of the estate of Polly Robinson, grandmother of said Edgar A. Parks, Austin R. Parks, Polly E. Bray, and Francis Eugene Brooks. Said Polly Robinson was a resident of the village of Birmingham, Oakland county, Mich., and died on or about January 31, 1889, testate, leaving as direct heirs at law and beneficiaries under her will two married daughters, Anna E. Parks and Martha J. Brooks. At the time of testatrix's death, Anna E. Parks had one daughter and two sons, said Polly E. Bray, Edgar A. Parks, and Austin R. Parks; and Martha J. Brooks had one son, said Francis E. Brooks, subsequently deceased, son of defendant Eugene Brooks, who is the husband of Martha J. Brooks, and therefore uncle by marriage of complainants.

Testatrix's will was dated October 5, 1881, and disposed of an estate inventoried at $61,809.62. Excepting five small bequests aggregating $150, this estate was all left to and divided between the two daughters Anna E. and Martha J. and their children, with a provision that, in case of the decease of any one of the children before receiving his or her share, said share should go in equal proportions to the surviving broth-

ers and sisters of such deceased child or children. Luther Stanley, of Birmingham, was nominated executor in this will, and for a time acted as such; but after three or four years he resigned; and defendant Eugene Brooks was appointed on December 27, 1892, by the probate court of Oakland county, administrator *de bonis non* with the will annexed, and had continued in charge of the estate as such administrator up to the time of filing this bill.

A portion of the estate was a business block in Pontiac, located on the main business street, and a farm of 110 acres in the township of Troy. By the provisions of testatrix's will; the Pontiac store property and the Troy farm, so called, were given for life to her daughter Martha J. Brooks, wife of defendant Eugene Brooks, and after her decease to her son Francis Eugene Brooks. This is the property involved in the present litigation, complainants' deed of which to their cousin it is sought to have set aside. Material paragraphs of the will essential to an understanding of the questions at issue are as follows:

*Third.* I give and bequeath to my daughter, Martha J. Brooks, my house and five village lots in Birmingham, which is my present homestead, together with all the household furniture therein. I also give and bequeath to my said daughter the use of my store and lot in Pontiac, Oakland county, Michigan, during her lifetime, and after her decease I give and bequeath the said property in Pontiac to her son, Francis Eugene Brooks.

*Sixth.* I give and bequeath to my daughter, Martha J. Brooks, the use of my farm, situated on the northeast quarter of section 19, in the said township of Troy, during her liftime, and after her decease I give and bequeath said property to Francis Eugene Brooks.

*Twelfth.* After the legacies and bequests hereinbefore mentioned are disposed of, settled and paid, I give and bequeath all of the remainder of my personal and real estate which I now have or may hereafter acquire as follows, to wit: The use of one-half thereof

I give and bequeath to my daughter, Anna E. Parks, during her lifetime, and after her decease I give and bequeath the said one-half of my said property to her children to be divided equally between them. I give and bequeath the use of the remaining half of all my said property to my daughter, Martha J. Brooks, during her lifetime, and after her decease I give and bequeath the said remaining half of my said property to her heirs.

*Thirteenth.* I hereby order and direct that in case of the death of any of my grandchildren before the time of receiving his or her share of my property as above specified, the share belonging to such deceased child or children shall belong to the brothers and sisters of such deceased child, to be equally divided between them, and in case of all the children of one of my said daughters shall die before the time of receiving their share of said property, then I order and direct that the said shares shall be given to the children of the other daughter, to be equally divided between them.

*Fourteenth.* I hereby order and direct that before any of the rents and profits of the lands hereby set apart to my daughters for their respective use that my executor or legal representatives shall first retain and pay the taxes out of such rents and profits upon the lands of the children of such daughters, and that my said executor shall see that no timber be cut upon such land while held for the grandchildren.

Anna E. Parks died February 26, 1903. Francis E. Brooks died December 5, 1907, while his mother, Martha J. Brooks, was yet alive and in the enjoyment of her life estate. She died March 25, 1914, about seven years after the death of her son. The fact that Francis E. Brooks died before his mother, who held the life estate to the property in question, is the event which gives importance to the deed sought to be set aside, which was obtained before his death by his father, defendant Eugene Brooks, from the children of the latter's wife's sister, Anna E. Parks, as the children of Anna E. Parks, but for said deed, would have be-

come fee owners of the Pontiac business property and Troy farm on December 5, 1907, entitled to possession and full enjoyment thereof on March 25, 1914, by happening of the contingency provided for in the concluding portion of paragraph 13 of their grandmother's will.

Defendant Eugene Brooks had entire charge of the estate for many years, its final settlement being deferred by provisions of the will. The beneficiaries apparently had full confidence in him, relied upon his judgment, and left its management entirely to him without interference.

Upon the death of Anna E. Parks in February, 1903, a partial distribution to her heirs followed under the provisions of the will, and at about the same time defendant obtained from them the quitclaim deed in question running to his son, who was then residing with his parents at Birmingham, apparently in good health, attending the Detroit Medical College as a student. Receipts for the legacies he then paid them are dated March 9 and 10, 1903, and the deed is dated March 9, 1903. This deed, covering the Pontiac store property and Troy farm, was carefully and skillfully drawn to cover their contingent remainder by a competent attorney of Pontiac whom defendant employed to prepare it. He then took it to his niece and nephews and obtained their signatures, himself acting as notary and signing the certificate of acknowledgment. It is undisputed that no consideration was paid, nor did anything of value ever pass to the grantors for signing this instrument. The circumstances of its execution and the representations by which he obtained complainants' signatures are matters in dispute which will be referred to later.

Not long after he had secured the deed, defendant negotiated with and sold the Pontiac property to Joseph S. Stockwell, the then judge of probate, for $8,000;

his son executing a deed of the same to said Stockwell. Defendant received from Stockwell $3,000 in cash and a $5,000 mortgage for the balance running to his son, which he at once caused to be assigned to the Polly Robinson estate, taking out of the estate $5,000 which he deposited to his own account—in effect, as administrator, buying the mortgage for the estate from his son, he himself, however, appropriating the money under the claim as made in court that the son then owed him. The health of his son failed, and he developed tuberculosis in the spring of 1904, going to Colorado at the close of college that year, continuing there and in Florida in failing health during most of the time until his death in 1907. Defendant testified that he advanced him money from time to time before and during his illness, amounting to as much or more than was received for this property, but whether he had at that time advanced him $3,000, or $4,000, or $5,000 he could not tell.

On March 2, 1906, the son, Francis Eugene, deeded to his father, defendant Eugene Brooks, the Troy farm for a stated consideration of $6,000. This deed was not recorded until October 2, 1908. The Troy farm had been charged up to defendant in the inventory of the Polly Robinson estate at $6,000 and so carried in the administrator's account until shortly after recording this deed to himself, when defendant deducted from the assets of the estate in his hands, amounting to $24,398, the sum of $6,000, thus reducing its assets for which he was accountable as administrator to about $18,000. Thereafter, with the record title of this farm in himself, he continued in control of it as owner until September 23, 1913, when he sold it to defendant Skrine and wife for $10,500, receiving $8,000 in cash and a mortgage for $2,500. It appears undisputed by these proceedings that all proceeds from the sale of both the Pontiac business property and the

Troy farm were appropriated, whether rightfully or not, by defendant Eugene Brooks during the time he was acting as administrator of the estate of Polly Robinson.

Austin R. Parks, one of the sons of Anna E. Parks, testified that he signed the deed in question understandingly, with full knowledge of its import and the contingent interest which he had in the property according to the will of his grandmother, and declined to join his brother and sister as complainants in this suit. Defendant Flora W. Martin was the wife of Francis Eugene Brooks, deceased, and is not shown to have any legal interest in this litigation.

The bill of complaint prays that the deeds of the Pontiac store property and Troy farm be set aside and canceled so far as complainants Polly E. Bray and Edgar A. Parks are concerned, if practicable, and, if it is disclosed this cannot be done, that defendant Eugene Brooks be decreed to account to complainants for their respective interests in the property and the proceeds thereof in accordance, as near as may be, with the provisions of their grandmother's will. It appeared upon the trial, and was ultimately admitted by complainants, that defendants Stockwell and Skrine were innocent purchasers of the respective parcels of property they had secured title to, for value and without notice of any infirmity in their chain of title or claim of fraud in procurement of the quitclaim deed in question, and therefore the deeds should not be set aside as to them.

The suit was heard on pleadings and proofs taken in open court, resulting in a decree that defendant Brooks account to complainants for their respective interests in the property and proceeds from the sale thereof, the details of such accounting to be determined by supplemental decree following the accounting, and

the bill was dismissed as to defendants Stockwell, Skrine, and Martin.

The quitclaim deed in controversy, dated March 9, 1903, was acknowledged by the grantors on March 14, 1903, according to the certificate of acknowledgment signed by defendant Brooks as notary. On its face the signatures of all the grantors appear to have been witnessed by defendant and Minnie T. Jarvis, an employee in the Exchange Bank at Birmingham, where defendant also worked as bookkeeper. It is undisputed that Austin Parks executed the deed in the presence of both witnesses and acknowledged it before defendant Brooks, who then went alone with the paper to complainants at their homes, where they signed it at his request, in his presence but not in the presence of Miss Jarvis. Edgar Parks and wife deny acknowledging it before defendant or any other notary, while Mrs. Bray states that she acknowledged it to her uncle in answer to his interrogation.

Complainants claim that at the time this instrument was signed by them in their respective homes at the request of defendant he led them to believe, or represented, that the property described in it was a part of their grandmother's estate, which went directly to their cousin Francis Eugene upon the death of his mother and would not belong to them under any circumstances; that the store property at Pontiac was sadly out of repair and had been condemned, requiring a large expenditure to put it in condition, and it was then desirable to get a clear title to the property so that it could be disposed of and Francis receive the benefit of his share as they just had of theirs upon the death of their mother; and that they signed the paper after learning their elder brother had done so, confiding in defendant and believing his representations, without any knowledge or understanding on their part that they were releasing anything of value

to them or any property that might some day become theirs, fully trusting in their uncle, who was then and had been for many years in charge of this property as administrator of their grandmother's estate; that they first learned they had released valuable interests in said estate which otherwise belonged to them under the provisions of their grandmother's will, after the death of their aunt, Martha J. Brooks, by whose life estate it was burdened, and about the time their uncle filed his final account in the probate court as administrator, asking its allowance and his discharge.

It is the claim of defendant that the matter of releasing complainants' interest in this property was first suggested by part or all of the children who signed it shortly after receiving their distribution; that he had the deed in question prepared by an attorney in Pontiac and presented it to them for execution, when they signed it freely without any persuasion or misrepresentation on his part, apparently with full knowledge and understanding of its import and nature.

Of the circumstances attending their signing the deed, as detailed by complainants, Edgar Parks testified, in part: That his uncle Eugene Brooks called at their home one day, saying he was in a hurry and did not sit down. He produced a paper which he did not read, but stated that as they had got their share, or were going to get it, it was no more than right that Frank should get something then, and he would like to have witness and his wife sign the paper, which was a release of the store and farm willed to Frank, so that he would have the benefit of the property, and he ought to have it if he was ever going to.

That he "said my brother and sister had already signed it, and he said it was all property that would never come to us anyway.  *  *  *  He said it was willed directly to Frank, and if Frank died it would go to him.

"Q. Did he explain why he wanted you to sign the paper?

"A. Nothing more than the store property had been condemned, and he said that it would take a great deal of money to repair it.  *  *  *  Well, I simply signed it because he asked me to.  He told me it was on property that could never come to me; that it went direct; it was left direct to Frank."

That witness believed those statements, and, relying upon them, signed the paper without reading it, first learning he had signed a deed conveying a valuable interest in the estate after the death of his aunt in 1914.

Ella Parks, Edgar's wife, gave testimony to the same effect, stating Mr. Brooks said he was in a hurry and talked to them but a moment or two, stating he had a paper which he would like to have them sign, and laid it on the table, telling what property was described in it; that she understood the farm was left to Frank after his mother's death, and the store property also; that he stated each piece was worth about $5,000, and said he would not ask them to sign off all their rights to everything, but only on that property that went to Frank anyway; that she had never seen a paper of this kind before, but had perfect confidence in him, thinking he understood about the will and that it was all right, as he had been managing the estate for a time further back than she knew anything about; that the paper was something entirely new to her, as she had never heard of it before, and she did not know she was signing a quitclaim deed, but first learned that she had signed a deed containing valuable interests in the estate when Mr. Brooks was putting in his claim for part of the remainder before the probate court.

Polly Bray testified, in part, that she first saw the paper in her own house when her uncle Eugene first

brought it there at a time when no one was at home but herself, and asked her if she was willing to sign it so Frank would receive his share before his mother died, describing the two pieces of property to her, and that she did as he requested; that he "did not come, to me at all and ask me about the paper until the day I signed it"; that everything was left to him to look after, and he had been trusted in the management of the estate, and she did not understand she was parting with anything of value which might some time come to her from the estate, but depended upon her uncle and relied upon his statements as to the paper.

Though denying that he made any misrepresentations, and testifying that complainants were fully advised by him of their rights under the will, when asked if, before the time of presenting the deed to complainants for execution, there had been any discussion to the effect that some day he would bring them a deed of this property to sign, Brooks replied:

"I don't recall whether I did or not, but I don't think so."

Asked if he ever told complainants that they would get nothing in the Pontiac property or Troy farm under any circumstances, he replied:

"Well, I might have said the probabilities were that they would not get anything in that property so long as my boy was in good health, and the prospects were that he would live longer than his mother."

In his version of what complainants said after he had given them their distribution, he quotes them, not as saying they proposed to part with any of their interest of value in the estate, but:

"That Frank should have his part of the property that his grandmother willed him, and not have to wait until his mother died until he got it * * * That Frank should have that real estate that his grand-

mother willed him, and what his grandmother willed him."

We are impressed, as was the trial judge, that the testimony of defendant Brooks, considered as a whole, in the light of the undisputed facts and circumstances, is far from satisfactory and convincing; and are not prepared to disagree with the court's conclusions that:

"His manner of giving it and his memory or lack of memory are such that I am unable to believe a considerable part of the vital portions of it. * * * If he did not actually misrepresent the contents and character of Exhibit A (the deed), he told them as little as possible and secured their signatures."

It is urged in behalf of defendant Brooks that he was not a trustee of the property belonging to the estate which he was administering and did not occupy such fiduciary relations towards complainants as to in any way prevent him from acting as agent for his son in perfecting his title to this property, or afterwards receiving the proceeds of its sale or taking title to it from his son in payment of debts the latter owed him; while it is contended for complainants that, by reason of his official position as administrator of the estate, he was at all times acting in a fiduciary capacity and held such confidential relations with complainants as to preclude him from acquiring, directly or indirectly, interests in property of the estate adverse to theirs, or which would tend to defeat their rights as provided by the terms of their grandmother's will.

It is undoubtedly the law that defendant Brooks cannot, by reason of being the administrator, be classed in a technical sense as the trustee of this estate holding legal title to it and primary use of it in trust for the benefit of another; but, in a broader sense of the expression as commonly understood and as recognized by courts of equity in considering duties and

188 Mich.—42.

responsibilities of one situated as he is shown to have been, his control of this estate involved fiduciary, confidential trust relations between him and complainants. By whatever name it may be best expressed, the principle applicable to such a situation is thus clearly stated in *Keech* v. *Sanford*, 1 W. & T. Eq. Cas. (4th Am. Ed.) 44, 62, which was quoted with approval in *Trice* v. *Comstock*, 121 Fed. 620 (57 C. C. A. 646, 61 L. R. A. 176), by Judge Sanborn:

"Wherever one person is placed in such a relation to another, by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject or property or business, (he is in such a fiduciary relation with him that) he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated."

In considering the situation presented by this record, strict rules of law touching parties dealing at arm's length are of scant application. Defendant Brooks is far older than complainants, of a generation preceding theirs, and their uncle by marriage. They had known him from their childhood in the associations and confidence of kinship. They all resided in the same town, where the grandmother of a yet preceding generation had resided, and died many years before leaving an estate tied up by a somewhat lengthy and complicated will in the details of deferred administration and contingencies, but by its general scheme and most readily understood provisions dividing the estate between her two daughters for life, after which it was to go to their children or heirs. So long as the two daughters lived, none of the grandchildren was given any legal participation in the use and enjoyment of the estate. So long as either lived, the estate could not be closed, and its executor or administrator was charged with certain duties in respect to conserving it. Since 1892, when appointed as admin-

istrator with the will annexed, those duties rested upon defendant Brooks. Through all those years he had full charge and control. Complainants were not consulted as to its management, so far as shown, nor informed in regard to the details. They had confidence in, relied upon, and fully trusted him without question until their aunt, his wife, died in 1914. Shortly after their mother died, in 1903, and he had distributed to them several thousand dollars each from their grandmother's estate, he went to them with a personal appeal for their signatures to a paper which, as they were led to believe, was necessary to let their cousin Frank come into the immediate enjoyment of a portion of the estate which they supposed ultimately would be his, and which their uncle stated would never go to them under any circumstances. That they would and did rely upon him, believed what he said, and did what he asked, seems but natural and beyond reasonable doubt. What he said to them and they to him at that time are matters in dispute, with the preponderance of evidence, we think, in favor of their contention; but significant things which he did in that connection and the results are not in dispute.

At this opportune time he journeyed to Pontiac and employed an able attorney to draw up this deed to his son, which he had properly executed and witnessed at the bank by Austin, the older brother, who states he had talked it over with his uncle before and fully understood just what he was doing. He then went with it to the homes of complainants and procured their signatures when no one else was present. On its face it appeared to have been executed by all in the presence of two witnesses and duly acknowledged. Such in fact was not the case, and he knew it. As to complainants it was not entitled to record. It would undoubtedly have been equally good as a common-law deed between the parties without witnesses or ac-

knowledgment, and the irregularity is only material in its significance as to his conduct. He was a notary, a business man of experience in conveyancing, knew two witnesses were required to the execution of a deed, and provided them for Austin's signature at the bank, but, with the instrument so prepared that it would appear regular, secured the signatures of complainants when he was alone with them. He promptly had this deed recorded and sold the Pontiac store property, for $8,000, to the judge of probate in whose court he was acting as administrator of this estate, receiving $3,000 in cash and a mortgage of $5,000, which he, as agent of his son, cashed by selling it to the estate, for which he as administrator purchased it. During this time his son was a student in college, married, dependent upon his father, and, as the latter testifies, heavily indebted to him. There is no evidence that the son ever spoke to or communicated with complainants on the subject, or requested his father to act as agent for him in procuring this deed, made any suggestions or gave any directions as to what he desired done, or in any manner took part in the proceedings beyond signing such papers as his father prepared and presented to him. Asked if he had consulted his son with reference to his part in the proceeding before he carried it out, defendant answered, "I think I did." His reason for withholding the deed of the Troy farm, given him by his son, from record for two years and until after his son's death, was "pure carelessness on my part." Asked why, at the time he recorded the deed, he deducted from the amount of property which belonged to the estate the $6,000, he answered:

"I had no reason, only I wanted to sell the place at that time, and advertised it for sale."

He sold the place for $10,500, giving the grantees a deed with an expressed consideration of $1. That he,

though ostensibly acting as agent for his son, was personally, if indirectly, interested in securing this deed from complainants, seems clear; and it is undisputed that, as a result of his activities as agent for his son, he personally, while administrator of this estate, realized the sum of $18,500 as proceeds from the sale of property which, but for the deed, would by their grandmother's will have gone to the children of Anna Parks. It cannot successfully be denied that in these transactions he, while in a position demanding official impartiality as administrator of this estate, placed himself in relations which ordinarily excite a conflict between self-interest and integrity.

It is urged that complainants' rights are cut off by laches resulting from delay. With this view we cannot concur. Laches does not necessarily grow out of a mere lapse of time. Complainants' rights in and to this property were prospective and contingent. They were not enforceable until the happening of subsequent events. The possession and use of the property belonged to their aunt during her life. Shortly after her death, they first learned the full significance of the paper they had signed and of their rights under the will, after which this suit was promptly begun. Laches rests chiefly on the inequity of permitting a claim to be enforced by reason of changed conditions or relations of the property or parties resulting from delay. Here the delay has worked no wrong or changes, prejudicial to him, in the relations between complainants and defendant Brooks.

It is urged that complainants claimed ignorance of their rights, and execution of this deed through misapprehension of its import, under their contention, amounted at most to but ignorance of the law, or of their legal rights, which is no defense, and against which stands presumptive knowledge and notice by reason of the will and their deed, both of public record.

In that connection, as applied to this case, the equitable considerations of fraud and mistake are allied. The general rule that ignorance of the law excuses no one, and a mistake in a matter of law is no protection, is common to all systems of jurisprudence. This rule is without exception as applied to the general laws of the country and one's rights or duties as defined by them, but as to strictly private rights under special conditions, involving exceptional cases within equity jurisdiction, it was long ago said:

"If a man, through misapprehension or mistake of the law, parts with or gives up a private right of property, or assumes obligations upon grounds upon which he would not have acted but for such misapprehension, a court of equity may grant relief, if, under the general circumstances of the case, it is satisfied that the party benefited by the mistake cannot in conscience retain the benefit or advantage so acquired. * * * If the mistake of law, or as to his private right, be that of one party only to a transaction, it may be either that the mistake was induced or encouraged by the misrepresentation of the other party, or that, though not so induced or encouraged, it was known to and perceived by him, and was taken advantage of, or it may be that he was not aware of mistake. Whatever may be the circumstances of the case, a court of equity may, under the peculiar circumstances of the case, grant relief. But if it appear that the mistake was induced or encouraged by the misrepresentation of the other party to the transaction, or was perceived by him and taken advantage of, the court will be more disposed to grant relief than in cases where it does not appear that he was aware of the mistake." Kerr on Fraud and Mistake, pp. 398, 400.

Under this exception it has been held that where a sister, being ignorant of her rights under a settlement, released them to a brother, the release was not binding. *Ramsden* v. *Hylton*, 2 Ves. 304. *Vide*, also, *Jordan* v. *Stevens*, 51 Me. 78 (81 Am. Dec. 556) ; and

*Trigg* v. *Read,* 5 Humph. (Tenn.) 529 (42 Am. Dec. 447), where the subject is exhaustively discussed.

It is further urged that, as the case now stands, complainants' bill is but one "for an accounting for damages for an alleged tort," which a court of chancery cannot entertain, as their claim involves no series of transactions between the parties concerning mutual demands and they have an adequate remedy at law. As a general rule, equity courts may compel an accounting where fraud is charged, or fiduciary relations exist. 4 Pomeroy's Equity Jurisprudence, § 1421.

This bill was primarily filed to set aside, and for relief from, an instrument under seal valid upon its face, purporting to convey title to real estate claimed to have been procured through false and fraudulent representations, and undue advantage taken by one in a position of trust and confidence towards complainants, a subject peculiarly within equity jurisdiction. That the intervention of innocent parties prevented the court from restoring title to complainants, and granting the full relief asked for as to all defendants, did not divest the court of jurisdiction to grant partial relief against the culpable defendant who availed himself of confidential relations to practice the imposition. Chancery courts have general supervisory power not only over trustees and strictly trust estates, but that power extends to authority to correct breaches of trust and fraudulent conduct on the part of all persons occupying relations of special trust and confidence with others. Grounds of equitable jurisdiction having been alleged and proved, a court of chancery may retain jurisdiction to fully dispose of the matter in its related issues.

"In such cases it is not necessary that the accounts should be mutual, or complicated, or that the bill should be framed for discovery, and it is no objection that an action at law sounding in damages may be brought

for the breach; the legal and equitable remedies are concurrent, and complainant has his election." 1 C. J. p. 622.

For the foregoing reasons, the conclusions reached by the trial court are approved, and the decree there rendered is affirmed, with costs to complainants.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice McALVAY, who sat in this case, took no part in this decision.