### McCULLEY *v.* RIVERS.

1. BROKERS—PRINCIPAL AND AGENT—GOOD FAITH—FRAUD.

It is the duty of an agent or broker to act towards his principal in entire good faith, and he is bound to disclose to the principal all facts within his knowledge which might be material to the matter in which he is employed.

2. SAME—PRINCIPAL AND AGENT—ATTORNEY AND CLIENT.

The fact that the broker dealt with his principal through an attorney did not excuse the broker from his duty to his principal; nor would lack of diligence on the part of the attorney to verify his representations or discover imposition or fraudulent conduct of the broker, whether active or passive, excuse the latter.

203—Mich.—27.

3. SAME—DOUBLE AGENCY.

   A broker may, with knowledge and consent of buyer and
   seller, lawfully act as agent for both.

4. SAME—LAND CONTRACTS—UNDISCLOSED DOUBLE AGENCY — VOID-
   ABLE CONTRACTS.

   Where a broker represented both buyer and seller to the
   ·disadvantage of the latter, in the sale of real estate, with-
   out disclosing his double agency to the seller, the con-
   tract was voidable at the option of the latter.

5. SAME—VOIDABLE CONTRACTS—FRAUD.

   It is not necessary for a party seeking to avoid a contract
   on the ground of undisclosed double agency to show that
   any improper advantage has been gained over him; he
   may repudiate or affirm the contract irrespective of any
   proof of actual fraud.

Appeal from Wayne; Chester, J., presiding. Sub-
mitted April 2, 1918. (Docket No. 8.) Decided De-
cember 27, 1918.

Bill by Irving G. McCulley against Addie Rivers
for the specific performance of a land contract. De-
fendant filed a cross-bill to rescind the contract on
the ground of fraud. From a decree for defendant,
plaintiff appeals. Affirmed.

*Stellwagen & MacKay,* for plaintiff.
*Ormond F. Hunt,* for defendant.

STEERE, J. Plaintiff's bill of complaint was filed to
enforce specific performance of a land contract dated
January 14, 1915, in which defendant agreed to sell
and convey to him a parcel of land in the city of
Detroit known as No. 48 Adams avenue east, for the
sum of $15,000, payable $100 down and the balance
upon delivery of the deed with abstract of title on or
before February 15, 1915, or as soon thereafter as
conveyance could be perfected. The instrument is a
short and plain land contract, the only variation from
standard form being a provision that:

"The vendor agrees that Walter C. Woolley is the broker who has brought about this sale, and agrees to pay said broker his commission of four hundred and fifty ($450) dollars."

Signed by the contracting parties, its execution is witnessed by W. C. Woolley and C. H. Gleason, who were the active representatives participating in the transaction.

Defendant filed an answer of denial, with cross-bill alleging that, through the connivance of Woolley and plaintiff, advantage was taken of her nonresidence and ignorance of real estate values in Detroit to fraudulently induce her by false representations as to the value of said property to sign a contract to sell the same for less than half its then actual market value; but that upon learning soon thereafter of the concealment and deception she promptly disaffirmed and repudiated the contract, giving notice thereof, on March 3, 1915, to plaintiff and his agent in the transaction, tendering back to both of them the $100 she had received, which they refused to accept but is still kept good by offer to pay the same into court, praying for dismissal of plaintiff's bill under her answer and cancellation of the contract as affirmative relief under her cross-bill.

Plaintiff answered her cross-bill and the case was thereafter heard before the circuit court of Wayne county in chancery on pleadings and proofs taken in open court, resulting in a decree denying specific performance and granting defendant the affirmative relief asked in her cross-bill.

Defendant became owner of this property under the will of Mrs. Helen Smith, a cousin of her mother, who died in Detroit on September 14, 1911. W. C. Woolley, who was in the real estate business in Detroit and had done work in that line for Mrs. Smith during her lifetime, was named as executor of her will. Upon

the same being presented for probate a notice of contest involving a codicil of the will was filed by a party in interest named Jennie Summers and the proceeding certified to the circuit court of Wayne county, where the case was pending for some time with a preliminary motion, preparations for trial and negotiations for settlement, which ultimately resulted in an adjustment of the differences out of which the contest arose and withdrawal of opposition, when the case was certified back to the probate court where the will was admitted to probate, in the fall of 1913, and Woolley as executor proceeded with administration of the estate.

The case yet lingered in the probate court when the contract in question was executed in 1915. Defendant had engaged C. H. Gleason, an attorney of Grand Rapids, to look after her interests in the estate, and while neither she, nor he as her attorney, was directly connected with the will contest, he went to Detroit in relation to the matter several times as her representative and learned in a general way the status of the estate, conferring with Woolley and the attorneys in the contest and helping as he could in the efforts to effect a settlement of the delaying litigation in order that defendant might secure possession of her share of the estate as soon as possible. He consulted and corresponded with Woolley from time to time, who the record indicates was active in the will contest and familiar with the affairs and assets of the estate, including this property which he had collected the rents upon and looked after for Mrs. Smith in her lifetime, continuing to do so for the estate after her death.

Defendant was not a business woman and knew nothing of real estate transactions or values in Detroit. She learned that Woolley was executor of the estate and that there was a will contest, but her knowledge of the progress of the probate proceedings and

value of the property left her was from or through Gleason who, as he testified, relied chiefly upon Woolley for information relative to the situation and assets of the estate, which he communicated to defendant as it came to him, including Woolley's proposals to sell this property for her and representations as to its value.

During the time this estate was in the courts and for years before, both plaintiff and Woolley were connected with or employees of a real estate activity in Detroit known as the Hannan Real Estate Exchange or Agency. Plaintiff testified that Woolley "was a broker in the Hannan Real Estate Agency," having been "a faithful employee of Mr. Hannan's" for many years, and that he (plaintiff) had been for several years "general manager of the apartment hotels operating for the Hannan Real Estate Exchange"; that Woolley, who he knew was executor of the Smith estate, twice proposed to him that he buy this property, stating the second time that he could sell it to him for $15,000 and plaintiff agreed to take it, stating, "I would not have bought this property had it not adjoined property in which my associate, Mr. Hannan, was interested." On cross-examination he further said:

"It was not necessarily essential that Mr. Hannan should get this lot to round out his property, but it would have been a good thing, inasmuch as Mr. Hannan and I had thought of building a hotel. * * * I had that in mind when I swore in the bill it was of peculiar value to me. There is a question of money involved, although, to a certain extent, it has a special value because Mr. Hannan owns the property all around it. I was associated with Mr. Hannan in this transaction, but there was nothing said to him about this property until after I completed the deal with Woolley. * * * I have lost nothing through having the abstract made, I am just out the $100 deposit money."

When Gleason visited Detroit in defendant's interest he examined with Woolley the appraisal in the probate proceedings and the tax assessor's valuation of this property and testified that Woolley, who he learned was in the real estate business and connected with the Hannan Exchange, told him the appraisal of $13,400 was above the actual value, the property being worth really about $10,000, and said he would like to act as their agent,—would look after it and when they got ready to sell he would get all it was worth for them as he knew real estate values in Detroit; that he believed Woolley's statements and assurances and did not otherwise seek to ascertain values, saying:

"I thought he was looking for our interest and, as administrator looking for the interests of all the beneficiaries in the will; and especially ours, because he had asked, said, he thought he could find a purchaser for the property, and he could sell it for all it was worth. * * * He continued collecting rents during 1912 and 1913 and up until about July, 1915."

With their relations thus established, a noticeable feature of the events leading up to the contract in controversy is that the offers and activities looking to sale of this property, which was in Woolley's hands as executor and under his control as an asset of an estate in process of probation, emanated from him; and in his communications with plaintiff, to or through her attorney in Grand Rapids, he not only depreciated its value below the probate appraisal and assessed valuation, but, as Gleason testifies, never at any time advised them of activity or increase in value of real estate in Detroit which the testimony shows was taking place during the time this property was in his hands, and to a marked degree in the vicinity of Grand Circus Park near which it is located. A petition was filed by him, as executor, in the probate court on February 6, 1914, asking for allowance of a special ac-

count for attorney fees in connection with the will contest, etc. The account began with drawing a petition for probate of the will, for appointment of a special administrator and other preliminaries, without date, followed by many dated items the first of which, dated September 1, 1911, is for "conference' between your petitioner" and the attorneys. In apparent explanation and justification of the account this petition states amongst other things:

"that the real estate in the city of Detroit is now of greater value than $71,000 [the probate appraisal], said real estate having during the past two years considerably increased in value, part of the same being situated at No. 49-51 Adams avenue east,  *  *  * said land being situated in the district where values have largely increased of late; that in your petitioner's opinion, the present value of said real estate is approximately $100,000."  *  *  *

This account was allowed by the probate court as filed.

It is not shown that defendant or her attorney, both living in Grand Rapids, had manifested or entertained any intent or desire to sell this property while proceedings involving it were pending in the probate court, except as Woolley agitated the subject from Detroit and made proposals, mostly by correspondence, through attorneys of the estate or his own letters. His first prospective purchaser was Mr. Hannan and the first proposition was in a postscript to a letter from attorneys who represented the estate to Gleason, dated April 13, 1914, as follows:

"P. S.—Mr. Woolley says that Mr. W. W. Hannan will pay $10,000 for No. 48 Adams avenue east (stating terms of payment); would Mrs. Rivers care to entertain this proposition?"

To this Gleason replied he would send the letter to her, but in view of the appraisal he would not advise her to take less than $15,000, a proposition he thought

she might consider. On May 15, 1914, the attorneys again wrote Gleason relative to certain matters touching the estate, stating in closing that Mr. Woolley wanted to know at what price defendant would sell the property, and concluding, "he says that Mr. Hannan would pay $500 or more down and the balance in cash as soon as the estate is closed." Gleason replied that she was undecided, but he was inclined to advise her to sell for $15,000, and saying: "Let me know what you think it is worth and what it ought to sell for. The executor has had charge of it so long he ought to be a good judge of the present value." Counsel for the estate replied to this letter on June 5, 1914, saying in reference to this inquiry: "I will further take up with Mr. Woolley the selling value of No. 48 Adams avenue east and write you in a few days," followed by a reply to other inquiries in which he was informed that defendant's share of the cost of administration, including her proportion of the Summers' settlement, amounting to $1,098.40, would more than absorb anything coming to her from rent of the property. It does not appear that counsel for the estate communicated further with Gleason as to the sale, or the "present selling value" of the property, but the executor thereafter communicated direct with Gleason, at one time visiting him in Grand Rapids to get defendant's price for Hannan as a prospective purchaser, at which time he stated the property was not worth more than ten or twelve thousand dollars. Of that interview Gleason testified:

"I replied that Mrs. Rivers said she wanted ($15,000) fifteen thousand dollars, that price was put on it because both I and Mrs. Rivers wanted that much out of it and because it was a little more than Mr. Woolley appraised it. I got no information other than through Mr. Woolley up to that time, nor had I investigated myself other than I have related with Mr.

Woolley. In fixing the sale price I relied upon what Mr. Woolley told me."

On the following day, July 24, Woolley wrote Gleason from Detroit referring to their conversation of the previous day and said:

"I neglected taking up my end of the transaction. That is this—I am acting in the capacity of broker, and in case a deal should be made for Miss Rivers' property I would expect the usual board rate of commission to be paid me for consummating the sale. The board rate of commission is three per cent. on improved property."

To this Gleason replied in part:

"I am satisfied Mrs. Rivers would wish $15,000 net for the property, so you better add $500 to the selling price and get your commission in that way, and at the same time leave $50 for my trouble."

Woolley replied rejecting "any such terms," and saying:

"If Mrs. Rivers, or you representing Mrs. Rivers, would like me to sell it, I can do it at the board rate here—the same as any other broker would do, on a three per cent. commission and get you what the property is worth and no more—and in doing this I would not divide my commission with any one."

In reply Gleason deprecated any implied sinister reflection on his proposal, explaining its intendment as he viewed it and stating Mrs. Rivers' selling price up to August 1st was $15,000 net. Gleason testified that Woolley subsequently inquired by telephone if defendant would take $12,000 for the property and later $12,500, which were refused. After this there appears to have been certain communications between them, the details of which are not made clear, resulting in something of an adjustment of previous views as to commissions and prices, for Woolley sent a letter to Gleason on January 14, 1915, inclosing $100 and this

contract, prepared in duplicate for defendant's execution, by which the broker's commission was taken out of her' previous net price. Of this Woolley stated in his letter:

"I have filled in this contract. The commission as stated over the 'phone, with understanding you are to have half of it, I did not fill in because for fear it might get into hands that should not know this. It is between you and me and you can take my word for it that you shall have one-half."

In returning the signed contract to Woolley her attorney stated, "Your letter as to matter of commission is sufficient." Correspondence followed as to the kind of abstract to be furnished and its cost, after which the attorneys to whom the abstract was submitted raised certain technical objections, which were discussed in correspondence, and during the delay. Gleason received information, as he testified, "that the price we had agreed to sell this property for was about half its value," and he then went over to Detroit to investigate. Shortly thereafter, within 60 days from the date of the contract, and before notified in writing by Woolley that "we are now ready to accept deed and title" of the property, he, with defendant's authority, served notice of rescission of the contract and tendered back the $100 she had received.

Upon the market value of the property when this contract was signed, defendant called seven witnesses who qualified to a greater or less degree as experts on real estate values in Detroit, and testified to familiar knowledge of sales and prices in that locality. Two of plaintiff's witnesses testified upon the subject. As to that issue of fact we find no occasion to disagree with the finding of the trial court that the weight of evidence fairly shows "the property in question at the time this contract was made was worth from twenty-two to twenty-five thousand dollars, which defendants did not know. * * *"

Woolley unfortunately died before this case was heard and it is earnestly urged that Gleason's testimony as to statements made to him by Woolley is inadmissible; but eliminating them from consideration the conclusion is unavoidable from the undisputed facts and written evidence that with his shown 18 years' experience in the real estate business in Detroit, handling this property for years as agent, executor and broker, he well knew its actual market value and future prospects of enhancement. His sworn report to the probate court in February, 1914, of which defendant and her attorney were ignorant, indicates his knowledge and views. He at that time estimated approximately a 40% increase in value over the probate appraisal of the East Adams avenue property belonging to the estate, which he truthfully states is located "in a district where values have largely increased of late." 48 Adams avenue east lies closest to Grand Circus Park, near to which experts testify to greatest appreciation in values. He not only refrained from imparting this information to defendant and her attorney, but in his communications with them asserted the value and endeavored to secure a price below the appraisal.

In reviewing this contention it cannot be overlooked that Woolley was, during these events, executor of the estate, in charge of this property as one of its assets, collecting the rents from the beginning until it was sold by him as agent and broker of defendant, as shown by his written statement. As executor of the estate and custodian of its assets during probation he held trust relations with defendant demanding utmost good faith. *Parks* v. *Brooks*, 188 Mich. 657.

"The executors or administrators occupy a position of technical trust. * * * They are not absolutely prohibited from dealing with legatees or beneficiaries in respect to the interest of the latter in the estate.

But if they do they must meet and overcome the presumption of fraud which the law raises against them. That is, they must show the entire fairness of the transaction, and will not be allowed to retain any advantage they may have gained if there is evidence of any misrepresentation, concealment or deceit, or evidence of any advantage taken of inexperience, ignorance or trustfulness of the other party." 1 Black on Rescission and Cancellation, § 48.

In his capacity as agent or broker the rule is well settled that it was his duty to act towards defendant in entire good faith and he was—

"bound to disclose to his principal all facts within his knowledge which are or may be material to the matter in which he is employed, or which might influence the principal in his action; * * * and the principle is applicable wherever the broker has an interest of any kind in the transaction antagonistic to that of his employer or where he is so situated as to be subject to temptation to act adversely to his employer." *Veasey* v. *Carson,* 177 Mass. 117 (53 L. R. A. 241, 58 N. E. 177).

"Loyalty to his principal's interests also requires that an agent should make known to his principal every material fact concerning the subject-matter of his agency that comes to his knowledge or is in his memory in the course of his agency." 31 Cyc. p. 1450, and cases cited.

The contention that defendant was represented by her attorney who in effect fixed the price and was presumed to protect her interests does not affect the controlling question here. He as attorney for her was not dealing at arm's length with her broker any more than she would have been. The fact that the broker dealt with her through an attorney presumably more competent than she would be did not excuse the broker from his duty to his principal, nor would lack of diligence on the part of her attorney to verify his representations or discover imposition or fraudulent conduct of the broker, whether active or passive, excuse

the latter. *Smith* v. *Werkheiser,* 152 Mich. 177 (15 L. R. A. [N. S.] 1092).

Gleason did know that Woolley was trying to sell this property to or purchase it for Hannan, by whom he was employed or with whom he was associated, at a price which was refused. His role there was a difficult one, but with knowledge and consent of buyer and seller he could lawfully be agent for both. Those efforts failed. That defendant had no knowledge of a double agency at the time of the contract is well established. Neither Gleason or defendant knew that Woolley was in any sense agent for McCulley when he produced him as a purchaser, nor of any employment or interests in common between them, or that they were both connected with the Hannan Exchange in familiar association, having desk room in the same suite of offices.

It is denied by plaintiff that Woolley was his agent in the transaction in any sense beyond looking after the conveyancing to him in closing the deal, as is customary for brokers to do for purchasers. In plaintiff's answer to defendant's cross-bill he—

"admits on information and belief that it was agreed between said defendant, through her attorney, and said Woolley representing complainant that when complainant was ready for a deed he would cause the same to be prepared and sent to defendant for execution. * * * He denies that said Woolley attempted to purchase said property while acting as executor of the estate mentioned in said answer by way of crossbill or as agent for the defendant, but says that he expressly informed the attorney for said defendant that he was in no way representing said estate or said defendant.

"He denies that said property is worth more than fifteen thousand ($15,000) dollars, but says that fifteen thousand ($15,000) dollars is the full value of the same and all it is worth. He further shows on information and belief that said defendant was not led to believe and also could not have believed that said

Woolley was acting for her in selling said property in any way."

Asked about this on cross-examination, although asserting he dealt with him as the agent of defendant, he replied, "Yes, Mr. Woolley represented me because there was nobody else to represent me." While expressing the opinion that he agreed to pay all the property was worth, he said, "I am no expert on real estate values, however"; he also stated during his examination, "Woolley was the only person I ever consulted about this proposition."

The unquestionably admissible, and for the most part written and undisputed, evidence in this case naturally adjusts itself to, and we think conclusively shows, a double agency in which the agent without the full knowledge or consent of the seller, his primary principal, also represented the buyer to the former's disadvantage. A contract so negotiated by the agent is voidable at the option of the seller, or principal by whom the agent was originally employed. "A broker cannot act as the agent of both parties where their interests are conflicting." 4 Am. & Eng. Enc. Law (2d Ed.), p. 966. *Vide,* also, 1 Am. & Eng. Enc. Law (2d Ed.), p. 1073, and 31 Cyc. p. 1572. In *Greenwood v. Spring,* 54 Barb. (N. Y.) 375, involving a double agency of this type, the court said that where application is made within reasonable time—

"It is not necessary for a party seeking to avoid a contract on this ground (undisclosed double agency) to show that any improper advantage has been gained over him; he may repudiate or affirm the contract irrespective of any proof of actual fraud."

The general rule was early recognized in this State. In *Moore* v. *Mandlebaum,* 8 Mich. 442, it is said of an agent for the seller:

"In that confidential relation he was bound to the utmost good faith, and had no right, while professing

to act in that capacity, to make himself the agent of other parties for the purchase of the lands he was authorized by plaintiff to sell; nor to take advantage of the confidence his position inspired to obtain the title for himself. Nor could he make a valid purchase from his principal, while that confidential relation existed, without fully and fairly disclosing to his principal * * * all the facts and circumstances within his knowledge in any way calculated to enable the principal to judge of the propriety of such sale."

The contract was voidable at the option of the seller.

The decree of the trial court is affirmed, with costs to defendant.

OSTRANDER, C. J., and BIRD, MOORE, FELLOWS, STONE, and KUHN, JJ., concurred. BROOKE, J., did not sit.