LANTIS *v.* WESTERN OIL & GAS DISTRIBUTING AGENCY.

LANDLORD AND TENANT—EQUITY—JURISDICTION—CANCELLATION OF
LEASE FOR FRAUD.
  Where a lease and the possession of property under it
  were obtained by fraud, a court of equity has jurisdiction
  to cancel the lease and dispossess the lessee.

Appeal from Saginaw; Snow (Ernest A.), J.   Submitted June 14, 1922.   (Docket No. 29.)   Decided July 20, 1922.

Bill by Fred Lantis, individually and as trustee, against the Western Oil & Gas Distributing Agency for the cancellation of a lease and for an accounting. From a decree for plaintiff, defendant appeals.   Affirmed.

*Stanley F. Quinn* (*Pulver & Bush,* of counsel), for plaintiff.

*Withey & Freeman* (*Farley & Selby,* of counsel), for defendant.

MOORE, J.   The bill of complaint is filed in this case by the plaintiff on his own behalf and in behalf of nearly 200 others claiming that a fraud had been perpetrated upon them in obtaining their money in connection with the organization of the defendant company, and in procuring a lease of certain property in Chesaning.   The prayer was for an accounting, and also, we quote:

"That the lease hereinbefore referred to and entered into with said Western Oil & Gas Distributing Agency by your orator on June 18, 1920, be canceled and held for naught.

On jurisdiction of equity to cancel instrument on ground of fraud, see note in 5 L. R. A. (N. S.) 1037.

"That the funds belonging to said station and in the hands of the defendant or that should be in the hands of defendant be turned over to your orator to be used in conducting said station business without any interference upon the part of said Western Oil & Gas Distributing Agency or any of its officers, successors, agents or assigns."

Concluding with a prayer for injunctive relief and with a general prayer for relief.

The case was tried at great length in open court and at its conclusion the chancellor said in part:

"At the time the negotiations between the subscribers, so-called, and the Western Oil & Gas Distributing Agency began, the Western Oil & Gas Distributing Agency was George Gundry, doing business under this assumed name. And it was about the time that the representatives of Mr. Gundry, doing business as the Western Oil & Gas Distributing Agency, solicited the contributions from the people in and about the vicinity of Chesaning, that the corporation was organized. The testimony shows the solicitations, most of them, at least, were made before the organization of the corporation, but the so-called certificates that were issued to the various subscribers (they are simply an evidence of the amount of money that was subscribed by the various people) were issued after the Western Oil & Gas Distributing Agency became a corporation, the date of the certificates being September 3, 1920.

"Counsel has suggested that the court will be a pathfinder in the law in this particular case. I do not think so. I see nothing very unusual about the case. It was conceived by Mr. Gundry or somebody else, that he might engage in a profitable business by establishing oil stations about the country, and he hired solicitors to go into a community and secure money for the purpose of building, erecting and constructing oil stations without any cost to himself. He was then to furnish the supplies for those oil stations. He was to take the oil station under a lease or contract between the subscribers and himself, for a period of 10 years, with the privilege of 10

years additional. That was his plan of getting an interest in an oil station constructed with the other man's money. And to that end, as I say, he hired agents to go about and obtain the subscribers necessary for the construction of this oil station. Referring particularly to the Chesaning oil station, the testimony is practically undisputed as to what took place there. There is no question but what this man represented to the people who invested in this enterprise that he was representing a corporation capitalized for the sum of $75,000. That representation at that time was not true, although a corporation was later organized with a capital of $75,000, part of it being paid in by the subscribers, sufficient at least to satisfy the laws of the State.

"It was represented to those various subscribers that they were to furnish money for the erection of this oil station; that they were to keep the money there in the bank at Chesaning, and that they were to elect a man of their own, as trustee to handle the money, and that money was at all times to be retained by the trustee for the use and benefit of those men who were subscribing to the erection of this oil station. It was not intimated to any of these men, by any of the solicitors, nor by Mr. George Gundry, nor by any of his assistants, that any charge was to be made for the solicitation of this money with which the oil station was to be erected. * * * On the contrary several subscribers asked where he was to get his profit from, and the reply was that it was the 10 per cent. that he was to have from the net profits of the concern, until the notes were paid and then 50 per cent. after they were paid. And during the entire organization of this concern, whatever it may be termed, it was represented to the various subscribers that the only thing that the Western Oil & Gas Distributing Agency was going to get out of this was the legitimate profits provided by the 10 per cent. until all notes were paid and after that they were to have 50 per cent. of the net profits.

"Now, the very first thing they did in violation of their representations and agreements was to take this commission out. They took $1,200 in cash that they did not represent to these people they were going

to take.    On the contrary, they distinctly told them they would not take it, and that the only money they intended to take was 10 per cent. and 50 per cent. of the profits.    Therefore it was a fraud perpetrated upon the subscribers by misrepresenting to them what they intended to do by way of deriving profits from the business.    The so-called plan doesn't show anything about it.    The plan only provides for the 10 per cent. and 50 per cent. of the profits, just as, they claim was represented to them.

"Now, the next thing they did was done without letting the people know about it.    They started to take one cent a gallon on gasoline that was sold to the Chesaning oil station, and they said to this man from Johnson Oil Company and the various oil companies they did business with, that when they sent a statement to the Chesaning station, they were to charge an. extra cent a gallon for gasoline and an extra half cent a gallon for kerosene.    This they had no business to do.    The distributing agency claims that this money was to be put into a fund with which it was to buy large quantities of oil, and thereby the Chesaning station was to profit by it.    That is an afterthought.    It is perfectly apparent that George Gundry took this money and tried to keep it from everybody.    He was dealing with these people in Chesaning under and by the terms of this contract, and he had no right if he was doing that, or had an arrangement whereby he thought it would result in a profit to the Chesaning station, not to let them know it.    He didn't do it.    *    *    *

"It appears from the evidence in the case that the people connected with this office were very much incensed about the fact when it became known that this cent a gallon on gasoline was being taken.    They had no right to take this cent a gallon, and it was an outrage upon these people.    How after this company had entered into a contract with the people of this character—trusting farmers in that community—how it could possibly do that—take a cent a gallon on gasoline and a half cent a gallon on kerosene, from those people who had honestly subscribed their capital is beyond my understanding.    It is an outrageous and unheard of proposition.    If that is not a fraud upon

these people I cannot possibly see what would constitute a fraud. * * *

"George Gundry, who organized this business, according to the testimony, and all people who were associated with him, did their best to keep this misappropriation of funds secret from everybody. Whether or not he took the money himself, I do not know. The Chesaning station never got any benefit from it. These people who entered into this contract expected to be dealt with honestly, but instead they were cheated and defrauded on every gallon of gasoline that went through the station, and on every single gallon of kerosene oil that went through there.

"When a contract is secured by fraud, a court of equity may set aside that contract. * * * The court then finds there is due from the defendant to the plaintiff the sum of $1,814.60. * * *

"The company succeeded to the rights of George F. Gundry under this contract, so far as receiving all of its benefits, and it must be held for any responsibility that might have been that of George Gundry. And taking that view of the situation, I hold that this company is responsible for the misrepresentations of these gentlemen; responsible for the taking of this commission, and responsible for the taking of this money from the sales of the oil and gas in the sum of one cent a gallon, and a half a cent a gallon on the kerosene, as has been testified to. Because of these things they are entitled to come into a court of equity and submit those facts to the court and ask that they be given redress.

"Therefore the plaintiff may have a decree in this case setting aside all contract relations between him and the defendants. And the amount which the court determines to be due from the defendant to the plaintiff is the sum of $1,814.60."

Counsel for appellant claim that the questions involved are:

"(1) The jurisdiction of a court of equity to dispossess a tenant under a written lease.

"(2) Whether or not trust relations existed between the trustee for the subscribers of the Chesaning station,

who is plaintiff in this case, and the Western Oil & Gas Distributing Agency, the defendant herein.

"(3) Whether or not the defendant was guilty of fraud which would justify a court of equity in canceling its lease with plaintiff.

"(4) The right of plaintiff to an accounting with the defendant and the judgment entered in this case."

Each of these questions is discussed in great detail by counsel.  It has already appeared that the chancellor found that fraud had been perpetrated on the plaintiffs.  It would profit no one to recite the evidence in detail.  A perusal of the record covering more than 200 printed pages shows that the chancellor was fully justified in his findings in that regard.

The important question then is whether a court of equity may dispossess a tenant under a written lease. Counsel argue with great earnestness that the defendant being a tenant of the plaintiff under a written lease, a court of equity, under the proofs offered at the hearing, had no jurisdiction to cancel the lease and dispossess the defendant.   We quote:

"Under these circumstances plaintiff has no standing in a court of equity and the court has no jurisdiction to dispossess the defendant and forfeit its lease. Plaintiff has a complete and adequate remedy at law. *Wilkinson* v. *Williams*, 51 Mich. 155, 157; *Gault* v. *Gault*, 158 Mich. 303, 306; *Beach* v. *Rice*, 186 Mich. 95, 100; 24 Cyc. pp. 1347, 1349, 1361, 1399; *Arnold* v. *Bright*, 41 Mich. 207, 209, 210; *McCombs* v. *Merryhew*, 40 Mich. 721, 725; *Sanford* v. *Newell*, 204 Mich. 95, 97."

We think counsel have overlooked the decisive questions in the case, to-wit, Was the lease obtained by fraud and was the possession of the property under it obtained by fraud?   A perusal of the record shows that an affirmative answer should be given to these questions.   Equity courts will take jurisdiction under

such circumstances as this record discloses. *John Hancock Mut. Life Ins. Co.* v. *Dick,* 114 Mich. 337 (43 L. R. A. 566) ; *Mactavish* v. *Kent Circuit Judge,* 122 Mich. 242; *Edwards* v. *Investment Co.,* 132 Mich. 1; *Fred Macey Co.* v. *Macey,* 143 Mich. 138 (5 L. R. A. [N. S.] 1036) ; *Excelsior Wrapper Co.* v. *Yund,* 176 Mich. 372; *Powell* v. *Pennock,* 181 Mich. 594; *Parks* v. *Brooks,* 188 Mich. 663.

The decree is affirmed, with costs to the appellee.

FELLOWS, C. J., and WIEST, McDONALD, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.