LOUD LUMBER CO. *v.* STERLING CEDAR & LUMBER CO.

CANCELLATION OF INSTRUMENTS — CONTRACTS — FRAUD — TIMBER LAND—RESCISSION—BURDEN OF PROOF.

On appeal from a decree of the court below rescinding a contract for the sale of a tract of timber land on the ground of fraud in misrepresenting the amount of timber thereon, evidence examined, and *held*, that the parties

were dealing with each other at arm's length, acting on their own independent investigations, and that plaintiff has failed to meet the burden of proof resting upon it as to the allegations of fraud and misrepresentation.

Appeal from Mackinac; Shepherd, J. Submitted June 18, 1918. (Docket No. 32.) Decided September 27, 1918.

Bill by the Loud Lumber Company against the Sterling Cedar & Lumber Company and others for the rescission of a contract on the ground of fraud and for an accounting. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

*Lucking, Helfman, Lucking & Hanlon* (*Victor D. Sprague,* of counsel), for plaintiff.

*Willis Baldwin* (*Henry Hoffman* and *Angell, Bodman & Turner,* of counsel), for defendants.

KUHN, J. This is a bill for rescission of a contract for the purchase of certain timber lands, on the ground of fraudulent misrepresentations by the vendor as to the quantity of timber thereon. The vendor was the defendant Sterling Cedar & Lumber Company and the land in question was a tract of 3,560 acres in Mackinac and Chippewa counties which the company had purchased in 1906, after an examination by its cruiser, Mr. John C. Scott, whose report showed 19,380,000 feet of merchantable saw-log timber thereon. The purchase price, according to plaintiff's claim, was $55,-820; according to defendants', nearer $80,000. On this tract, at the village of Charles, the company owned and operated a saw mill and shingle and tie mill. In 1909, it requested the Security Trust Company of Detroit to act as trustee under a bond mortgage proposed to be placed on this property. The trust company employed Mr. George F. Beardsley, of

Grand Rapids, to estimate the amount of timber on the land. He appears to have been an experienced estimator whom the trust company was accustomed to depend upon in large transactions of this kind. Beardsley's report showed 27,760,000 feet of merchantable timber and a later report of his added over 1,000,000 feet of balsam, bringing the total up to 29,340,000 feet. In 1910, Scott made a second cruise for the Sterling Company, at which time he reported 27,530,000 feet of timber. On May 1, 1911, the Sterling Company executed a serial bond mortgage to the Security Trust Company in the aggregate sum of $135,000, covering the entire tract and securing the payment of its bonds maturing in series annually from May 1, 1912, to May 1, 1920. These bonds were not sold to the public, but most of them were held as collateral by certain bank creditors of the Sterling Company. In August, 1912, the Sterling Company, being quite heavily in debt, inserted the following advertisement in the American Lumberman:

"FOR SALE—SAW MILL WITH TIMBER.

"An up-to-date going plant with 30M capacity circular mill; also shingle and tie mill, docks, store, dwellings, and camps, all going full force, with six thousand acres virgin hard and soft timber, cedar and pulpwood. Cut hardwood this winter, now cutting soft wood, especially located for water shipment in Michigan on Lake Huron. Entire cut can be contracted at good prices. Can arrange a bond issue; prefer retaining an interest, more timber in vicinity can be added; shingle timber for twenty years cut."

This advertisement attracted the attention of Mr. H. Kimball Loud, who was connected with the lumber business of H. N. Loud & Sons at Au Sable and Oscoda, and to his letter of inquiry Mr. W. C. Sterling, Sr., replied:

"We are running full blast, have not cut a tree on my land for five years, preferring to buy from others

and save my timber. Prefer to retain an interest with right party with experience.

"One hundred and sixty thousand will secure all but quick assets with many years good business and control of the Carp river timber.   *   *   *

"The property can be bonded for $135,000.00."

In the course of the negotiations which followed, it was represented by the defendants Sterling, according to plaintiff's claim, that there was close to 30,000,000 feet of saw-log timber on the property. The written Beardsley statement of the amount of timber, etc., on the land was delivered to Mr. Loud, but not the original estimate made by Mr. Scott. It appears to have been the understanding and desire of both parties that Mr. Loud should have an independent cruise of the land made to check up the Beardsley estimate. Mr. Loud wrote several times for the detailed estimate by forties, but all that was furnished him was Scott's 1910 estimate on 9 forties, the Sterlings claiming that the other detailed reports had been lost or mislaid. Mr. Loud's father was interested to some extent in the project, and in January, 1913, the Louds employed Mr. George Wilson to cruise the land for them. While Wilson was up there the first time, Mr. Scott, the Sterlings' estimator, who was acquainted with Wilson, came up to the tract and gave him what purported to be a summary by sections of his 1906 cruise, but which really contained the figures of his 1910 cruise, showing a total of 27,530,000 feet. This fact was unknown to the Louds until the trial of this case. In February of the same year Wilson went back to cruise the lands by forties, at which time he covered 33 out of the 89 forties and also went over some of the remainder roughly to get a general idea of it. He did not complete it at that time on account of the extreme cold weather. While he was up there, the Sterlings and the Louds and their attorneys were hav-

ing conferences and negotiations in Detroit and Monroe, which resulted, on February 15, 1913, in the signing of a contract providing for the sale of the tract to H. Kimball Loud for $160,000, the Louds to organize a corporation, to issue their own mortgage bonds for $160,000 and to give the Sterlings $50,000 of preferred stock and $122,000 in bonds. The Sterlings were to buy the remaining $38,000 of bonds for $34,000 cash to provide a working capital, the contract to be void if they failed to do so in 14 days. The Louds had the right to withdraw from the contract if the report of Wilson's cruise was unfavorable or if they could not raise the necessary money. At this time the Louds did not have Wilson's report, but had a telegram from him relating to 26 forties, and soon after received his report on the 33 forties together with some general statements as to the remainder. On February 19th, however, Mr. H. K. Loud wrote W. C. Sterling, Sr., that they had been unable to secure the money for a working capital and withdrew from the contract unless the Sterlings themselves could bond the property for $160,000. The Sterlings immediately took up the matter, and a meeting was arranged in Detroit for February 27th, at which Mr. Sterling reported that he could sell the bonds if the Louds would guarantee them, and offered to loan $17,000 for a working capital. The Louds wanted time to have the cruising completed, but the Sterlings insisted that haste was necessary. On March 1, 1913, the contract now sought to be rescinded was made and executed by the parties. It bears date February 28, 1913. It provides for the purchase of the timber tract for $160,000 and of the camp equipment and store for $7,000, to be paid for in the following manner: The Loud Lumber Company was to be organized with $100,000 common and $50,000 preferred stock, to be fully paid for by the property

purchased under the contract. The Loud Lumber Company was to assume $119,000 of the outstanding bonds of the Sterling Cedar & Lumber Company, which the Sterlings were to take and dispose of at 90c on the dollar; it was to turn over to the Sterling Company the $50,000 preferred stock, and to give its note for the balance of the $160,000, viz., $2,900, and for the further sum of $7,100 which the Sterling Company was to loan in cash for a working capital; also to give its note for $7,000 for the camp equipment. This arrangement was carried out, and the Sterling Company sold the $119,000 of bonds for $112,000. In order to facilitate the sale of these bonds, a few days after the contract was made Mr. Sterling wrote Mr. H. K. Loud:

"Wish you would write me some sort of a letter for our bond men advising: 'You bought the property on George F. Beardsley's estimate after having two of your own cruisers go over the standing timber, verifying the estimates of Beardsley and those the Sterling Cedar & Lumber Co. had, and satisfying yourself that the timber was there.' If you wish to elaborate a little, you can say, as your report sent us shows, that the cedar poles overrun about 16,700; pulpwood 750 cords, ties 100,000, posts 300,000, etc. Also comment on what cruisers say about chances of fire, conditions of roads in woods, Carp river for operating and driving, mills and docks, also value of land timber is on, and location of property as to freight rates and markets, etc."

The Louds accordingly wrote the brokers, McLaughlin, Rice & Davis, substantially along the lines requested. The Loud Lumber Company was organized in March, 1913, and commenced operations on the property, among other things building a five-mile railroad to the southeast corner of the property. From time to time the Loud Lumber Company employed Wilson to cruise particular forties as an aid to plaintiff in its lumbering operations. It was not until

March, 1915, that Wilson had sufficient information to make a complete report by forties, and his final report at that date indicated that there were but 15,-744,000 feet of timber on the tract at the time of the purchase.   In the fall of 1915, plaintiff employed Thomas Burrell to cruise the lands, whose report showed 5,558,000 feet of saw-log timber then on the tract.   According to plaintiff's records, it had cut 5,-891,366 feet, which would seem to indicate that there were but 11,449,366 feet on the land when purchased by plaintiff.   Prior to the hearing, plaintiff also employed William T. Tubbs and C. H. Fultz to examine the timber, who made detailed reports by forties, and their combined reports showed 4,254,000 feet of saw timber still on the land, which, if plaintiff's cutting records are correct, would mean that there were only 10,145,366 feet of saw timber on the land at the time of plaintiff's purchase.   After Burrell's report, plaintiff ceased to cut timber, and in October, 1915, filed the bill of complaint in this cause.   After a full hearing, the learned trial judge made the following findings:

"Reflection has confirmed my opinion formed at the conclusion of the taking of the testimony and on the arguments, that the Louds, in making the purchase, relied largely and substantially upon the representation of the officers of the defendant company that there was more than twenty-nine million feet of merchantable timber standing upon the lands purchased, and that no timber had been cut by the Sterlings since their purchase and estimated by the witness Scott.

"I find as a matter of fact that there was on the land at the time of its purchase by the Louds less than one-half the timber represented; and that while it was owned by them the Sterlings had done some lumbering on the land.

"The first of these misrepresentations, that is, as to the amount of standing timber, of itself constitutes such a fraud upon the plaintiff as confers upon it a right to relief in equity.   The plaintiff is the child of

the contract and may sue upon it. It is not barred by laches, delay or otherwise."

The decree provided that the deed and contract be set aside; that $47,500 of preferred stock and $7,000 bonds held by the Sterlings, and also the $2,900 and $7,000 notes, be canceled; that the Louds be held harmless for the $2,500 of preferred stock sold and on $90,000 of bonds outstanding; that an accounting be had, in which plaintiff shall be allowed all payments made on the railroad, one-half its expenditures on the mill, and all payments for permanent improvements; that the Loud account books be held final in the accounting for timber; and that the defendants William C. Sterling, Sr., and William C. Sterling, Jr., be held personally liable. It further dissolved some pending attachment suits and enjoined all actions at law.

Counsel for plaintiff, in their brief, state their claims as follows:

"1. That a deliberate, wilful fraud was perpetrated upon the Louds and the plaintiff who succeeded to their rights, by the defendants, who falsely represented to them that the Mackinac tract contained over 29,000,000 feet of merchantable saw-log timber plus certain forest products, that the Beardsley cruise was correct and the timber and forest products therein set forth was on the lands, that Scott's cruise of nine forties was all the defendants had left of his total cruise and was a fair average of the eighty-nine forties, that Beardsley's cruise and Scott's cruise roughly checked with each other, that the defendants had not cut timber or forest products on the lands since September, 1907, i. e., for five years prior to September, 1912, and not since the date of the Beardsley 1909 cruise. And that the concealment of the Scott 1906 cruise of 19,000,000 feet and of the Sterling cutting since that date to 1913 was wilfully fraudulent, even if based on legal advice of defendant's attorney as claimed.

"2. That defendants fraudulently hurried the Louds and plaintiff into the transaction on the fraudulent

pretext that speed was necessary to secure a sale for the bonds and that the excuse therefor offered by defendants in their answer 'that negotiations for the sale of the bonds had progressed so far that expedition was advisable to assure a probable bond sale,' and the defense offered on the hearing that a delivery of the Scott 1906 cruise and checking thereof would have taken time and would have caused the Louds to 'continue their investigation for a longer period of time' is merely a fraudulent afterthought.

"3. That in cases of wilful and deliberate fraud, as distinguished from constructive fraud, laches is not a meritorious defense and will not be favorably regarded, and that equity will permit a rescission after some of the sold property has been consumed, allowing the fraudulent vendor consideration therefor and adjusting the equities between the parties."

After a careful study of the transaction which forms the basis of this litigation, we are unable to agree with the conclusion reached by the learned trial judge, and are convinced that the plaintiff has failed to make out a case entitling it to the relief prayed for. The circumstances on which its counsel place their chief reliance, while they might, if properly linked with other facts, have considerable weight as evidence of fraudulent dealing, in the absence of such supporting evidence can be as easily accounted for on the theory that the defendants were acting in perfect good faith in the matter. Plaintiff has by no means met the burden of proof resting upon it to establish fraud. We are impressed that the Louds were dealing at arm's length in the transaction, were taking nothing for granted, but intended to satisfy themselves, and did satisfy themselves, by an independent investigation that the amount of timber represented by the defendants was actually on the land. Indeed the record seems to indicate that the Sterlings were anxious to have them get a complete, independent estimate and were confident that it would verify the Beardsley

report. Such an estimate would be an added advantage in putting through the bond deal, which was a necessary part of the transaction. We find no evidence that Wilson was hindered or misled in any way in making his cruise or that he was not acting in good faith and for the interests of his employer. In the absence of such proof, we attach no significance to the fact that Scott was up on the tract at the time Wilson was cruising and went into the timber with him. The complaint made by the plaintiff that the Sterlings led the estimator into the best timbered portion of the tract and withheld from him the detailed reports covering the poorly timbered sections has little weight as evidence of fraud in view of the attitude of the Louds as disclosed by the very letters in which they asked for the detailed reports. On December 13, 1912, Mr. Loud wrote:

"If you have the detailed estimates, would you please let me use them? We could then plan to go where the timber is heaviest and not lose time on unimportant parts,"

And again:

"Can the detailed estimates be obtained from the Security Trust Company? * * * Without them considerable time would be wasted in going over descriptions on which there was not much timber to see."

Clearly their purpose in asking for the information was not to find where the poor timber was—their letters evince knowledge that there were poorly-timbered descriptions—but to enable them to spend most of their efforts in inspecting the well-timbered portions. The Sterlings claim that their purpose in withholding the information was to force the Louds to make a complete cruise of the entire tract. We do not see how the Louds can claim to have been deceived in this respect.

Again, we are unable to see any merit in plaintiff's contention that the Sterlings fraudulently hurried the closing of the deal before the Louds had completed their investigation. It appears that one contract had already been signed on February 15th, concerning which there is no claim of undue urging on the part of the Sterlings. By its terms it gave the Louds the chance to withdraw in case their cruiser's report did not show the amount of timber expected—in itself an evidence of good faith on the Sterlings' part—and the further opportunity to withdraw in case the Louds could not finance the deal. It was for the latter reason only that the Louds withdrew from that contract, and in announcing their failure they put it up to the Sterlings to see what they could do. Mr. H. K. Loud wrote:

"This is the last opening we know of as far as we are concerned for financing the enterprise, and apparently the only hope at present is in case you succeed in placing a bond issue of $160,000 upon the property. I sincerely hope that you may succeed in doing what we have been unable to do."

The Sterlings then took hold of the matter and did succeed in making arrangements with a firm of brokers to sell the existing bond issue upon a guaranty thereof by the Louds, and their urgency that the deal be promptly closed was that the results of their efforts in this behalf might not be lost through delay. Moreover, the Louds appeared so well satisfied with the information they already had from Wilson that they did not think it necessary to send him back to complete the cruising of the tract, and according to their own testimony, the only purpose for which they subsequently employed him from time to time to cruise particular descriptions was to aid them in their lumbering operations. The Louds explain their action in

entering into the contract as they did, without a complete report on the timber, and their subsequent failure to have Wilson promptly finish his cruise, by the alleged fact that at the conference at which the final contract was agreed upon, Mr. Sterling, Sr., guaranteed the correctness of the Beardsley estimate. Mr. H. K. Loud testified:

"All the talk I had with Mr. Sterling where he said he would guarantee the estimates, was in the room in the Pontchartrain. He said he would guarantee them there. I asked him, 'Will you guarantee those estimates?' He said, 'Yes.'"

Mr. H. N. Loud also stated that Mr. Sterling said he would guarantee the estimates, but the two Sterlings and Mr. Dixon, their attorney, denied that any such statement was made. No mention of any such guaranty is made in the written contract which was at once prepared. Both sides were represented by competent attorneys, the contract was drawn by the Loud's attorney, not by the Sterlings', it was carefully prepared, and there was every opportunity for the parties to safeguard all their rights. Indeed Mr. Sterling, Jr., testified that Mr. Helfman, while drawing the contract, asked particularly, "Is there anything about a guaranty to go into the contract?" and that both the Louds and Sterlings said, "No." This is disputed, but, however that may be, it is undisputed in the testimony, and in fact is admitted by Mr. H. N. Loud, that Mr. Helfman did inquire whether the contract contained the complete understanding of the parties, and that it was approved by both sides. We think the omission of any guaranty in the written contract is almost conclusive proof that no guaranty was in fact made or relied upon.

Another claim of plaintiff does not seem to us to be established by the evidence, viz., that the Sterlings had cut upwards of 5,000,000 feet of timber from the

tract since the Beardsley estimate was made. The most that can be said to have been shown is that a few men were cutting on the tract for about two weeks, and the testimony leaves it uncertain whether this cutting was before or after the Beardsley estimate. According to the best recollection of the witness, this cutting was done on section 14, and if this is true, the record shows that Mr. H. K. Loud had personal knowledge of it prior to the making of the contract. In describing his trip into the woods in January, 1913, he said:

"When we got out into section 14, going through the hardwoods, we came to a place where there was some cut—I noticed that. I said, 'Why here is some cut.' He (Scott) said, 'Yes, they cut—the Sterlings cut a little hardwood some years ago.'"

Complaint is also made that at the outset of the deal the Louds were furnished with Beardsley's report as representing the amount of timber on the tract, but the Scott cruise made in 1906 was withheld from them. We do not think it has been proven, however, that the Beardsley report was incorrect. The attempted proof of fraud in connection with his estimates we think has utterly failed. The fact that he was interested in an adjoining tract appears to have been in no way connected with his obtaining the employment. It was a mere accidental circumstance. The Sterlings had nothing to do with his selection, and it is difficult to see how they could have fraudulently manipulated his examination. Beardsley appears to have been a reliable man and his estimate to have been made in perfect good faith, and we are strongly impressed that it represented correctly the timber as he found it. We think the greater part of the discrepancy in the results of the various cruises can be accounted for by the fluctuations in the condition of the lumber market. Mr. H. K. Loud testified:

"When we bought, the conditions were quite favorable in the lumber business, but the prices dropped all right enough, and the demand, in some cases, went down to nothing. We didn't sell a tie in 1914. The ties stood on the dock—didn't a one move. The demand was fierce. * * *

"Q. Isn't it true, Mr. Loud, that when you purchased this in 1913—or at the present time now, there would be money in getting out a class of material that didn't pay you to get out in the summer of 1913 or 1914 or 1915?

"A. One could get out some material—low grade—when the prices are high, that you couldn't afford to do when they are low."

The estimates are of the *merchantable* saw-log timber on the tract. In a depressed condition of the market, a considerable quantity of timber would necessarily be classed as unmerchantable, because it could not be profitably cut and marketed, which would become merchantable upon a sufficient rise in the prices of lumber. Scott's original estimate was made for use as a basis of *purchase* by the Sterlings and was doubtless made as low as possible. Beardsley's figures appear to represent a fair estimate of the merchantable timber in a normal condition of the market. Scott's second estimate reached practically the same result. Wilson's estimate at the time of the Loud purchase overran Beardsley's in some respects. It is only in the amount of merchantable timber claimed to have been found on the descriptions covered by Wilson's later cruises, made during the period of depression in the lumber business, that the great deficiency appears. Moreover, his detailed report in 1915 happened to include a few descriptions already covered by his first cruise in 1913, and it is a significant fact that the figures as to these descriptions have been reduced substantially in his later estimate from those first reported. Plaintiff says in this connection that some timber had been cut in the meantime on these

descriptions, and that if this fact does not account for the entire discrepancy, it is proof that Wilson was tampered with in making his first estimate. But it might equally well be proof that his later estimate was made on a different basis than the former because of a change in market conditions, which excluded much of the timber from the class of merchantable.

As has been stated, we are satisfied that the plaintiff has not met the burden of proof resting upon it as to the allegations of fraud and misrepresentation, and are therefore constrained to reverse the decree of the court below, and a decree may be entered dismissing the plaintiff's bill of complaint, with costs to the appellant.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.