GARLICK *v.* LAKE SHORE LUMBER CO.

1. PRINCIPAL AND AGENT — COLLUSION — PRINCIPAL MAY AVOID FRAUDULENT CONTRACT MADE BY AGENT.

A person may avoid a contract made by his agent as a result of fraud or collusion between the agent and the person with whom he makes the contract.

2. EQUITY—ABUSE OF CONFIDENCE—RESCISSION OF CONTRACT.

Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which necessarily grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted by a court of equity to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed.

3. PRINCIPAL AND AGENT—COLLUSION — ABUSE OF CONFIDENCE — FRAUD—RESCISSION.

Where a person in the pay of a lumber company gained the confidence of the owner of timber land, of the value of which it had much and the owner little knowledge, and, without revealing his connection with the company, induced said owner to enter into a contract by which he agreed to deed the land to it as trustee for a corporation to be formed, in consideration of which he was to receive stock in said corporation, but the company made no effort to live up to its part of the contract, said contract may be repudiated by the owner or his representative irrespective of any proof of actual fraud.

4. SAME—COLLUSION—EVIDENCE—SUFFICIENCY.

Evidence *held*, sufficient to show that defendant company and the owner's agent, who was secretly in the pay of the company, conspired together to get the timber for much less than it was worth.

5. SAME—CANCELLATION OF INSTRUMENTS—TENDER OF STOCK IN ESCROW NOT NECESSARY.

Where the stock issued to said owner was placed in escrow by defendant and had never been in his possession, and defendant by its fraudulent conduct made it impossible for him to raise the money to redeem it, the law will not require, before commencing suit to cancel the contract and set aside the deed, that said stock be actually tendered back and sufficient money paid to reimburse defendant for payment of taxes, interest, etc., especially where it will be worthless if the deed is set aside.

6. SAME—RATIFICATION—ACCEPTANCE—FRAUD OF AGENT.

Where the owner's agent was secretly colluding with defendant to overreach him, his acceptance of the proceeds of the sale would not amount to a ratification of said agent's acts.

Appeal from Ontonagon; Driscoll (George O.), J. Submitted January 20, 1922. (Docket No. 122.) Decided October 2, 1922.

Bill by Mary Belle Garlick, individually and as executrix of the last will of Wilmot H. Garlick, deceased, against the Lake Shore Lumber Company and others for the rescission of a certain contract and deed, and for an accounting. From a decree for plaintiff, defendants appeal. Affirmed.

*Van Slyck & Walsh* (*A. W. MacLeod* and *W. D. Tillotson*, of counsel), for plaintiff.

*Rees, Robinson & Peterman* (*John Jones*, of counsel), for defendants.

BIRD, J. This litigation was tried in the circuit court for the county of Ontonagon before the Honorable George O. Driscoll, circuit judge. At the conclusion of the proofs he filed a carefully prepared written opinion which includes a statement of facts and questions involved. It is given below in full ex-

cept certain holdings on questions which were material in the circuit court but not important here:

"Plaintiff, Mary Belle Garlick, filed this bill individually and as executrix of the estate of her deceased husband, Dr. Wilmot H. Garlick, to rescind and set aside a contract and deed, to obtain an accounting and to obtain other relief.

"The history of this controversy, which I find from a most careful examination and analysis of the entire record, briefly stated, is as follows: Defendants M. H. Sprague and M. S. Lamoreaux, together with O. A. Lamoreaux and E. E. Kenfield (hereinafter called the Sprague people), owned defendant Sprague Company, an unsuccessful corporation, Sprague being its president. Desiring certain timber owned by Garlick, Sprague and one E. E. Johnston, in August, 1914, set out to procure it. In this they afterwards advised with M. S. Lamoreaux. Throughout the transaction Johnston was under the influence of and receiving money from the Sprague Company, or Sprague, or both. These parties and the Garlicks were unacquainted. The Garlicks were non-residents (Californians) with limited knowledge of the value of their timber and none of the value of the Sprague Company's properties. Johnston, apparently a versatile man, in November, 1914, went to Los Angeles and introduced himself to Garlick in the role of a corporation promoter. He found Garlick (a man about 79 years of age) to be quite heavily in debt, with his timber mortgaged, but having a cash offer for the timber which, if accepted, would discharge his indebtedness and leave him a large surplus. On this and subsequent calls he gained the confidence of Garlick. Through Johnston's efforts Garlick and the Sprague Company, in December, 1914, reached an agreement whereby Garlick, in consideration of the Sprague Company's undertaking to at once provide $40,000 to discharge his indebtedness, agreed to join in the organization of a new corporation. The Sprague Company did not have this money, the Sprague people showed no inclination to produce it, and nobody but Johnston seems to have made any effort to raise it. Nevertheless defendant Sprague, writing for the company, repeatedly, while Johnston was attempting to raise the

money, informed Garlick that everything was 'alright' and was 'proceeding as planned.'  Finally, as a result of a conference held at Milwaukee, Wisconsin, between Johnston, the individual defendants, one Landeck (whom Johnston had in some manner gotten into the deal), O. A. Lamoreaux, and a firm of Milwaukee lawyers which represented some or all of the last named persons, the contract of May 12, 1915, was drawn up at Milwaukee by the lawyers.  It reads as follows:

" *'This. Contract of Agreement*, made this 12th day of May, 1915, by and between the M. H. Sprague Lumber Company, of Washburn, Wisconsin, a corporation organized under the laws of the State of Wisconsin, party of the first part, and Wilmot H. Garlick, of Los Angeles, California, party of the second part, *Witnesseth:*

" *'That, Whereas,* the party of the second part is the owner of thirty-eight hundred and fifty (3,850) acres of timber land located in Carp Lake township, county of Ontonagon, State of Michigan, and

" *'Whereas,* the party of the first part is the owner of a certain mill, mill site, dock and logging equipment; and

" *'Whereas,* it is intended to organize a corporation to be known as the Lake Shore Lumber Company, which company is to be organized according to the articles of association hereto attached and made a part hereof; and

" *'Whereas,* certain negotiations between the parties separately located are necessary to be carried on before said corporation can be finally organized; and

" *'Whereas,* it is necessary that certain conveyances of property intended to be made to said proposed corporation must be executed and certain undertakings assumed during such intervening period;

" *'Now, Therefore,* for mutual considerations passing between the parties and mutual benefits to be secured through the completion of such final incorporation and the relation of the parties herein to said corporation, it is agreed by the parties hereto as follows:    That the party of the second part and his wife shall convey all the wood and timber now growing, standing or fallen on a certain tract of thirty-eight hundred and fifty (3,850) acres of land located in Carp Lake township, Ontonagon county, State of Michigan, to the M. H. Sprague Lumber Company, trustee.    That the party of the second part and his wife are to execute a certain forty thousand ($40,000) dollar mort-

gage, to secure payment of the seventeen notes. of the party of the second part, payable respectively as appears in said mortgage, to the Continental & Commercial Trust & Savings Bank of Chicago, trustee, upon said timber and property so to be deeded. That the consideration for the conveyance by said party of the second part to the M. H. Sprague Lumber Company, trustee, party of the first part, shall be determined as follows:

" 'A representative of the said party of the second part and a representative of the party of the first part will cruise and determine the total amount of merchantable log timber upon said thirty-eight hundred and fifty (3,850) acres. That if the said two representatives cannot agree as to such estimate, they shall together select a third representative for the purpose of arriving at such agreement; and if they cannot agree within fifteen days after the precipitation of such differences upon the selection of such third representative, such third representative shall be selected by the circuit judge of the Bayfield county district, which three representatives as herein provided shall agree on such estimates. That all of such totals shall be appraised as of the value of three dollars per thousand. That upon the organization of said Lake Shore Lumber Company, a proposed corporation, which shall be issued to the party of the second part, stock in said corporation equal to the amount thus arrived at.

" 'That so likewise, in the appraisal of the value of the mill, mill site, dock and logging equipment and properties of the party of the first part, the appraisal shall be completed in the same manner and form and by the same persons provided for the appraisal of the merchantable log timber of the party of the second part; and so likewise upon the completion of said Lake Shore Lumber Company, a corporation, there shall be issued to the party of the first part an amount equal to such appraised valuation thus arrived at.

" 'It is further understood and agreed by both parties hereto that upon the completion of said corporation there shall be issued to Edmund E. Johnston, of Ontonagon, Michigan, an amount of stock in said corporation representing ten (10%) per cent. of all the stock at any time outstanding; it being further understood that if any amount of stock is issued subsequent to the stock issuance herein referred to, to the respective parties of the first and second parts for the carrying out by said corporation of the negotiations represented in a certain contract to which Edmund E. Johnston and W. H. Garlick are parties, or referred to in a certain correspondence between the

party of the first part and Edmund E. Johnston, that for such additional stock so issued either out of the stock for which the company is now organized or in the event that said amount of stock is increased, that the proportion of stock to be granted to the said Edmund E. Johnston shall be increased by further issuing to him of additional stock, so that at all times his stock shall represent one-tenth of the total stock outstanding of said corporation.

" 'It is further understood and agreed that in addition to the thirty-eight hundred and fifty (3,850) acres known as the Garlick land, there shall be promptly acquired under arrangements now pending, as is known to the party of the first part, between Edmund E. Johnston and other holders of the timber, additional timber to the amount of twenty-one hundred and fifty (2,150) acres, making a total of six thousand (6,000) acres, which additional stock of timber shall be paid out of either of the original stock or additional stock of said Lake Shore Lumber Company, and upon the issuance of which additional interest shall issue to the said Edmund E. Johnston upon the basis hereinbefore indicated.

" 'It is further understood and agreed that the stock herein provided to be issued in said corporation to the said party of the second part shall be deposited in escrow with the Continental & Commercial Trust & Savings Bank of Chicago by said party of the second part, there to remain until said forty thousand ($40,000) dollar mortgage and notes have been completely paid and satisfied.

" 'It is further understood and agreed that the execution of said forty thousand ($40,000) dollar mortgage shall be security for the payment of seventeen notes payable respectively as appears in said mortgage.

" 'It is further understood and agreed that the consideration to said parties of the second part for the conveyance of the interest in said thirty-eight hundred and fifty (3,850) acres of land hereinbefore referred to shall be paid to them and received by them according to the following provisions:

" 'For all timber cut upon said lands the said proposed corporation shall at once be indebted to the said party of the second part in an amount equal to three ($3) dollars per thousand of merchantable log timber. Said amount so accumulated shall be set aside by said corporation in a fund in the nature of an accumulation or sinking fund for the first and primary purpose of paying the indebtedness according to the tenor of said notes and mortgage, and shall be held in trust by said Lake Shore

Lumber Company for said purpose, and shall not be mingled with the general assets or funds of said corporation; that in the event of said amount so accumulated in said sinking fund shall exceed the sum of ten thousand ($10,000) dollars at the time of maturity of any portion of said indebtedness, such excess shall at reasonable intervals be applied to the diminishing and payment of said indebtedness; that in the event said amount so accumulated for said timber shall be less than the amount of matured indebtedness under said mortgage, said Lake Shore Lumber Company shall pay said matured indebtedness under said mortgage and notes promptly according to their tenor.

"'It is further agreed that the deposit in escrow of the stock of said parties of the second part with the Continental & Commercial Trust & Savings Bank of Chicago shall be deposited as a pledge and security for the benefit of the mortgagee of said forty thousand ($40,000) dollar notes and mortgage, which deposit shall be accompanied by a contract to be executed by said parties of the second part for that purpose; and said deposit in escrow shall be for the purpose of repaying to the proposed Lake Shore Lumber Company, a corporation, of any amount paid by said Lake Shore Lumber Company, a corporation, upon any matured indebtedness under said forty thousand ($40,000) dollar mortgage and notes which said Lake Shore Lumber Company, a corporation, may incur by the necessity of making advance payments on such matured indebtedness over and in excess at any such time of the amount of credit which has accrued at three ($3.00) dollars per thousand in said hereinbefore mentioned accumulation or sinking fund, or the payment of any taxes or liens now on said land so to be conveyed in excess of forty thousand ($40,000) dollars.

"'It is further understood and agreed that upon the signing and execution of said forty thousand ($40,000) dollar notes and mortgage, each of said notes shall be at once indorsed in his individual person by each and all of the stockholders of said Lake Shore Lumber Company, viz: M. H. Sprague, M. S. Lamoreaux, O. A. Lamoreaux and E. E. Kenfield, and that said same notes shall be indorsed by the proper officers of the Lake Shore Lumber Company immediately upon the completion of its organization.

"'It is further understood and agreed that all the dividends declared by said Lake Shore Lumber Company, a corporation, which shall accrue to the benefit of the stock provided to be issued to the said parties of the second part, shall be applied to the payment of said forty thousand ($40,000) dollar notes and

mortgage, and shall be withheld from the personal benefit of said party of the second part up to and including the time when such forty thousand ($40,000) dollar notes and mortgage are completely satisfied and extinguished.

" 'It is further understood that wherever said forty thousand ($40,000) dollar mortgage and notes are referred to herein, that it shall be understood to include not only said principal indebtedness, but all accumulated interest and charges incident to said indebtedness.

" 'It is further understood and agreed that upon the completion and organization of said Lake Shore Lumber Company, a corporation, that so far as practically possible the respective officers now held in said M. H. Sprague Lumber Company shall become like officers in said Lake Shore Lumber Company.

" 'It is further understood and agreed that Edmund E. Johnston shall act in the capacity of Land Commissioner for the protection of the interests of the parties of the second part, and that at upon the organization of said Lake Shore Lumber Company, said party of the first part will use their full power and endeavor as stockholders in said proposed corporation and as officers thereof, to establish a reasonable retainer and compensation of said Edmund E. Johnston for the business of insuring to the party of the second part the full cutting of timber as the work progresses upon said thirty-eight hundred and fifty (3,850) acres.

" 'It is further understood and agreed that said now officers of said M. H. Sprague Lumber Company will establish banking connections for the credit of said Lake Shore Lumber Company upon its completed organization, and that the now stockholders hereinbefore named will, so far as necessary, indorse all notes of the Lake Shore Lumber Company in an amount not to exceed twenty-five thousand ($25,000) dollars for a period not to exceed two years subsequent to the completion of said Lake Shore Lumber Company, a corporation; that is to say, that said stockholders will extend their personal credit and accommodation for the benefit of said Lake Shore Lumber Company as herein indicated.

" 'It is further understood and agreed that the salaries provided for the proper officers of said Lake Shore Lumber Company, a corporation, shall be in such reasonable amounts and not higher, as are now paid and established by custom for like services under like conditions.

" 'It is further understood that the mutual undertakings herein shall be binding upon the parties hereto, their heirs, successors and assigns.'

"The contract was executed by the Sprague Company at Milwaukee. Johnston afterwards, in some manner not shown by the evidence, induced Garlick to execute the contract. Garlick afterwards fully performed his part of the contract, plaintiff joining where necessary.

"The articles of association of the Lake Shore Company, although bearing date the (blank) day of April, 1915, were not acknowledged until August 16, 1915, or filed until August 17, 1915. An elaborate set of blank minutes of stockholders' and directors' meetings were apparently prepared for use on August 18, 1915, but it is at least doubtful whether or not any actual use was made of them. Sprague and O. A. Lamoreaux, assuming to act as president and secretary, respectively, of the Lake Shore Company, under that date, executed an instrument in its name undertaking to pay the $40,000 indebtedness and assume the Sprague Company's obligations under the contract of May 12, 1915, About the same date Johnston and Sprague got together and issued Lake Shore Company stock as follows: $100,000 to the Sprague Company (for its mill site and mill only) ; $75,000 to Garlick (on the basis of 25,000,000 feet of timber) ; and $17,500 to Johnston (for his and Landeck's services, outlays and expenses in organizing the company). This was at least $30,000 more than the Sprague Company was entitled to and at least $30,000 less than Garlick was entitled to under the terms and provisions of the contract of May 12th. The Garlick stock was turned over to the trust company and never reached his or plaintiff's hands or sight.

"Garlick and plaintiff, on and under date of September 4, 1915, while Garlick was confined to his home by his last illness and apparently also before he knew how much stock had been issued to him, at the request of all of the parties in interest, conveyed to him by a letter of the trust company dated August 21, 1915, executed the deed herein sought to be set aside, which is a warranty deed conveying to the Lake Shore Company the Garlick timber. Garlick's health had been failing for a year and he died, testate, October 14, 1915. Plaintiff's interest in the property in question will be hereinafter referred to.

"Sprague took charge of the Lake Shore Company's

affairs in August, 1915, and, assuming the presidency, while still remaining president of the Sprague Company, sold the former the latter's logging outfit and lumber for some $29,000. He also bought some $18,500 worth of additional timber for cash and on credit, repaid himself some $827 he had paid Johnston for putting through this deal, paid the Milwaukee lawyers some $1,100 and a cruiser employed by Johnston some $370; but he did not turn over to the Lake Shore Company the Sprague Company property until July 1, 1916, and he did not start operations for the Lake Shore Company until August, 1916. Meanwhile he logged, sawed, and sold some 3,000,000 feet of timber for the Sprague Company without accounting to the Lake Shore Company therefor and charged the Lake Shore Company with interest on the purchase price of the Sprague property as well as with his salary. None of the material parts of the contract of May 12, 1915, except that relating to the indorsement of the notes and mortgage, were ever carried out on the part of the Sprague Company or Lake Shore Company. All interest in it appears to have been lost as soon as the Garlicks executed and delivered the timber deed. The timber was not cut, the notes were not paid, no sinking fund was established, and Garlick was charged on the books with the interest on the loan. Only $1,850 had been paid on the $40,000 at the time of the hearing herein.

"The Lake Shore Company operated during two seasons. Then in the spring of 1918 defendants Sprague and Lamoreaux determined to sell out the property and evidently decided on Lamoreaux as the purchaser. Their procedure towards this end is not at all commendable. Sprague turned over to Lamoreaux for reply a letter from her counsel showing plaintiff to be in financial straits with the property of the estate and herself 'all tied up.' It was an appeal to the company to release the Garlick land (not the timber) from the mortgage so that she might dispose of the mineral rights, and Lamoreaux answered by first laying a plausible (but, to one knowing the facts, not a satisfactory) foundation therefor and then announcing the necessity of a 50 per cent. assessment to establish a $100,000 working capital and, as an alternative, the proposition that she turn

over to his companies (other corporations which he, O. A. Lamoreaux and Kenfield owned) all the Garlick interests in the Lake Shore Company in consideration of their purchasing the mortgage and releasing the land (not the timber) therefrom.   Haste in decision on plaintiff's part was urged owing, *inter alia*, to alleged necessity to build camps.   Camps had in fact been long previously built.   Much correspondence and an interview followed, which, although interesting and quite important, I pass by for lack of space.   It should be remarked, however, that through all of it the intention to sell out the company's property was never mentioned to plaintiff or her counsel.

"In September, 1918, the Johnston stock was divided up among Lamoreaux and Sprague and their relatives, business associates and employees, and thereby more than eight stockholders were created.   A stockholders' meeting was then called for October 1, 1918. Notice of this meeting was caused to be served upon the plaintiff by an officer in California.   This meeting was adjourned from October 1st to November 1st, from November 1st to November 15th, and from November 15th to November 22, 1918.   During its progress the articles of association were amended, a board of directors was elected, defendant Lamoreaux presented a bill of one of his companies and threatened suit if it was not paid, and also presented an offer to purchase the entire property of the Lake Shore Company for $100,000, with the express understanding that he was not to be liable for any of its debts.   On November 22, 1918, this offer was accepted (all voting therefor except plaintiff's counsel, who was present and voted and protested against it) and the property was turned over to Lamoreaux as of November 1, 1918. At this time, according to the report of a public accountant employed by defendant Lamoreaux, the assets of the company amounted to over $360,000, over $102,000 of which were liquid assets.   The sale was dated back to November 1, 1918.   Defendant Sprague continued to manage the business the same as before.

"At the time of this sale there were no judgments or liens of any nature against the company.   No creditors were pressing it except defendant Lamoreaux's company just mentioned.   The business outlook was good. There was a good market for lumber.   The company

had some $70,000 worth of treasury stock which it never tried to sell. It never tried to float any bonds or borrow any money from outsiders to provide a working capital.

"At the meeting of November 22, 1918, plaintiff's counsel served upon defendants Lake Shore Company and the Sprague Company notice of rescission of the contract of May 12, 1915, and also served upon defendant Lamoreaux a notice that plaintiff had declared said contract terminated and rescinded, and further, that if for any reason the contract was held not rescindable, plaintiff would hold him for $3 per thousand feet of all merchantable timber cut from the land pursuant to the terms of the contract.

"There is nothing to show that plaintiff or deceased or any of their counsel ever knew anything about Johnston being under the pay or influence of the Sprague people until after this suit was commenced, or, in fact, until after the hearing was commenced, nor did any of the last mentioned persons before the time of the commencement of this suit, or, in fact, until about the time of the hearing herein, know that the Garlicks did not get all the stock they were entitled to under the contract of May 12, 1915, or that the Sprague Company got more stock than it was entitled to under such contract.

"The bill has been several times amended. As finally amended, it sets up a fraudulent conspiracy to deprive deceased and plaintiff of their timber, and fraud in the procurement of the execution of the contract of May 12, 1915, and the deed of September 4, 1915, and want and failure of consideration for the execution of each of these instruments, and prays that the contract may be rescinded and canceled, that the deed may be set aside and that an accounting may be had as to the amount of timber cut from the Garlick lands. The answer denies that there was any conspiracy or fraud on either or any of their parts, denies that there was any want or failure of consideration, or, at least, any such as would entitle plaintiff to the relief sought, and charges fraud on the part of the Garlicks in concealing from defendants the fact that the lands in question had been deeded by deceased to the plaintiff, alleges misjoinder of parties and want of necessary parties, that the plaintiff waived any fraud,

if there was any, and that she has been and is guilty of laches.   *   *   *

"Was There Fraud in Procurement of the Contract?

"This involves a consideration of all the evidence in the case, and especially of the facts and circumstances leading up to the execution of the contract, all of which have been most carefully considered.   It is well settled that a person may avoid a contract made by his agent as a result of fraud or collusion between the agent and the person with whom he makes the contract.   31 Cyc. p. 1573.   It is also a well settled rule that relief will be afforded in equity in all transactions in which 'influence has been acquired and abused, in which confidence has been reposed and betrayed.' Bispham's Principles of Equity (7th Ed.), p. 352.   The author (p. 355) says:

" 'Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which necessarily grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed.   There can be no contract between the two, except after the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish the contract with the person so trusting him.'

"The evidence in this case shows that Johnston during his entire connection with this transaction, or at least since November 13, 1914, was under the pay and influence of the Sprague people.   The books, Johnston's letters, Sprague's testimony and Johnston's acts and conduct throughout this deal show this. Sprague, at the hearing, with great reluctance, however, was forced to admit that Johnston was under his pay at least up to June, 1915.   His testimony shows that Garlick was never told that Johnston was receiving money from them.   The record shows that up to June, 1916, they had paid Johnston $827.66.   Sprague testified:

" 'Q. You advanced this money before the contract was made with Dr. Garlick?

" '*A.* Yes; it had to be done.

" '*Q.* Did Dr. Garlick ever ask you to advance money to Johnston?

" '*A.* Why, I don't suppose he did. The matter would never come up.'

"No one can read this record fairly and impartially without coming to the conclusion that Johnston was always under the Sprague Company's pay and influence, that he worked himself into the confidence of Garlick while acting under the pay and for the benefit of the Sprague people and used the influence growing out of that confidence to obtain an advantage for the Sprague people. Garlick had no thought of going into any deal with the Sprague people until Johnston went out there under their pay and induced him to do so. By means of his first visit he induced Garlick to make a proposition which the Sprague people accepted. It then became their duty to live up to that agreement. It was his duty, if he was a mere corporation promoter as he represented himself to Dr. Garlick to be, to use his best efforts to see to it that they did so. They made no effort to live up to it. He knew that, unless, indeed, he was their agent in that respect, for he and Landeck are the only persons who appear to have done anything towards raising the money which the Sprague people's acceptance made it their duty to raise. He stood by at the meeting at Milwaukee and, without a word of protest, heard defendant Lamoreaux make statements which amounted to a flat repudiation of that agreement. He did not inform Garlick that they had repudiated the agreement. It is unbelievable that Garlick ever would have entered into the contract of May 12, 1915, if he had known of the actions and conduct of the Sprague people and Johnston with reference to this December, 1914, agreement, or if he had known that Johnston was under the pay and influence of the Sprague people. The Sprague people knew that Johnston would be and was incapable of being a true and faithful agent for Garlick. Yet they aided and assisted Johnston in getting Garlick to allow Johnston to act for him in this transaction. It does not lie in their mouths to say they did not have anything to do with inducing Garlick to trust his affairs to Johnston.

They sent Johnston to him in the first place.    They at least took part in formulating the contract appointing Johnston land commissioner.    The lawyers who drew it were afterwards paid by Sprague out of the Lake Shore Company's funds.    Sprague was their paymaster.    Johnston's letter of April 1, 1915, shows that Sprague was in correspondence with these lawyers.    The Sprague people occupied a fiduciary relation towards Garlick in this deal.    They were bound to disclose to him all facts within their knowledge material to his interests.    They knew from his letters to them that he reposed confidence in them.    Their signing of the contract was a representation to him at least that they were not aware of anything which would disqualify Johnston to act as his agent.    It was their duty, under the circumstances, to have fully informed Garlick of Johnston's relations to them. They did not do so.    On the contrary, they wrote him on February 6, 1915 (at which time they had seen Johnston many times and received many letters from him), saying:

"'Will say that since the deal in question started we have only seen Mr. Johnston two or three times and that he has not at any time written to us.    It seems to be a peculiarity of his to avoid letter writing.'

"It would be unjust to permit a contract to stand which was procured under the circumstances shown by the evidence in this case.    Such proceedings are not countenanced by law.    31 Cyc. p. 1573; *Towle* v. *Dunham,* 76 Mich. 251; *McCulley* v. *Rivers,* 203 Mich. 417; *Pearce* v. *Ware,* 94 Mich. 321.

"In this case it is not necessary for the plaintiff to show that any improper advantage has been taken of deceased.    She may repudiate the contract irrespective of any proof of actual fraud.    The contract is avoidable at her option.    *McCulley* v. *Rivers, supra,* and authorities cited; *Brigham* v. *Investment Co.* (Mo. App.), 186 S. W. 15; *Ripley* v. *Lead & Zinc Co.,* 221 Fed. 209; *Kilgore* v. *Norman,* 119 Fed. 1006; *Beach* v. *Wilton,* 244 Ill. 413 (91 N. E. 492); *Peter* v. *Wright,* 6 Ind. 183.

"Was the Deed of September 4, 1915, Procured by
Fraud?

"If there should remain any doubt in any one's
mind after considering the circumstances under which
the contract of May 12, 1915, was procured, that it
was procured by breach of trust and overreaching,
such doubt must speedily vanish upon consideration
of what afterwards took place.

"Johnston had the Garlick timber estimated as early
as February or March, 1914. He himself had been
over the timber. Sprague had been over it a number
of times. They were both experienced timber esti-
mators. Sprague testifies that in the early stages of
the negotiations to procure this timber there was an
understanding between him and Johnston that if the
latter could get the Garlicks to go in on the deal the
Sprague people would put the mill in at $100,000
and the timber would go in at $75,000. The circum-
stances show, and some of Sprague's testimony tends
to show, that it was on the basis of this understand-
ing that the properties were afterwards turned in
and stock issued to the Sprague Company and Gar-
lick. There was in fact over 35,000,000 feet of timber
on the Garlick lands. The mill cost somewhere be-
tween $40,000 and $70,000. It had been used for
several years. It was carried on the Sprague Com-
pany's books at $65,000 or $70,000. It is fair to
assume that it was not worth more than $70,000. It
was through no mere mistake or error in judgment
that these men put in the Garlick property $30,000
too low and the Sprague property $30,000 too high.
Indeed, Mr. Sprague practically admits this, for
he admits that they disregarded some 7 or 8 million
feet of maple. He endeavors to explain that they
did this because in his judgment maple was not mer-
chantable, but several disinterested witnesses have
testified that it was, and the fact that it is is so well
known as to almost justify the court in taking judicial
notice of it. Were both the properties overvalued or
undervalued or were this the only instance in which
the Garlick interests severely suffered through the
conduct of defendant Sprague and Johnston, there
might be some foundation for the contention that
this was a mere mistake in judgment, but under the

circumstances shown here such contention cannot prevail.    Even the old estimates to which defendants' counsel so earnestly call the court's attention show from 1,700,000 to 3,600,000 more merchantable log timber on this land than these men put it in at, and defendants' testimony tends to show that these old estimates were 25 per cent. too low.

"Nor will counsel's explanation that the maple could not be rafted to Washburn avail.    The Sprague people are certainly more responsible than Garlick for the language in the contract of May 12, 1915.    The language therein does not exclude maple.    Maple is included in the old estimates as merchantable log timber, and Sprague's testimony shows that it was his intention to scow the logs to Washburn and not raft them.

"Garlick was thousands of miles away from these men when the acts here complained of were committed. He was, as he had a right to be, depending and relying upon them to treat him fairly and honestly and give him what was his due under the contract.    They took advantage of their positions, and especially of Johnston's position.    Their relations towards Garlick were, in the language of Justice McGRATH in *Finnegan* v. *Theisen,* 92 Mich. 173, 184:

" 'Clearly one of trust and confidence on the one hand, and of influence and power on the other.    The burden of proof, under such circumstances, is with him having influence and power, who is claiming to profit by the conveyance to himself, to show that the grantor, having the trust and confidence, acted freely, and with full knowledge of all the facts.'

"This case falls clearly within the principles laid down in the recent case of *McCulley* v. *Rivers, supra,* and in *Tompkins* v. *Hollister,* 60 Mich. 470; *Towle* v. *Dunham,* 76 Mich. 251; *Pearce* v. *Ware,* 94 Mich. 321; *Torrey* v. *Cement Co.,* 158 Mich. 348; *Pikes Peak Co.* v. *Pfuntner,* 158 Mich. 412; *Macey Co.* v. *Macey,* 143 Mich. 138 (5 L. R. A. [N. S.] 1036); *Donovan* v. *Campion,* 85 Fed. 71, 29 C. C. A. 30; *Miner* v. *Ice Co.,* 93 Mich. 97; *Lightcap* v. *Nicola,* 34 Pa. Sup. Ct. Rep. 189; *Williamson* v. *Stone,* 128 Ill. 129 (22 N. E. 1005); *Ripley* v. *Lead & Zinc Co., supra; Baltimore Sugar Refining Co.* v. *Campbell & Zell Co.,* 83 Md. 36 (34

Atl. 369) ; *Kilgore* v. *Norman, supra; Brigham* v. *Investment Co., supra.*

"The circumstances of the transaction were such that these men were necessarily trusted by Garlick, and where that confidence arises, no matter how, the duty of full disclosure immediately arises with it. Bispham's Principles of Equity (7th Ed.), § 232, p. 355, 356.

"The language of the court in *Brigham* v. *Investment Co., supra,* deserves quotation here:

" 'It will not do to say that plaintiff cannot recover in this case because it was the fraud of her own agent that deceived her. Because, as a matter of fact, the fraud was perpetrated by getting her to choose one of them as her agent, and then in that guise, and by that method, deceiving and over-reaching her.'

"*Lamoreaux's Connection with Transaction.*

"It is insisted by counsel that defendant Lamoreaux cannot be charged with complicity in any wrongdoing because he did not take any interest in it until the company became so heavily involved in debt that he had to take hold. The evidence does not bear out this contention. It shows that he was present at all the important meetings. He admits he was present at the time the May 12, 1915, contract was signed and at the time the corporation was organized. He also testified:

" '*Q.* When did you first hear of the Garlick deal in conjunction with putting in the M. H. Sprague Company's mill?

" '*A.* Sometime in the year 1914; I think the latter part of the year.

" '*Q.* Where did you hear about it?

" '*A.* On one of my visits to Washburn, at Mr. Sprague's office.

" '*Q.* You had various conversations with Mr. Sprague from time to time?

" '*A.* Yes. As the deal progressed Mr. Sprague would consult with me on the matter and tell me what the propositions were, etc.'

"The evidence shows that at the Milwaukee meeting held in the latter part of February, 1915, he demanded and brought about the complete repudiation of the December agreement and the drafting of the contract of May 12, 1915. The trust company letter (Exhibit

46) shows he was present at the conferences with the trust company just before the Garlicks were requested to execute the deed of September 4, 1915. For these and numerous other reasons which might be stated if space permitted, this contention cannot prevail.

"Has a Conspiracy been Established
by the Evidence?

"I think there has. Johnston has been referred to as a 'bright' man, also as 'peculiar' and 'hard to keep track of.' Before the contract of May 12, 1915, was executed Sprague had become well enough acquainted with his 'peculiarities' to be afraid to go into the woods with him. He was impecunious. His double dealing with the Garlicks is proof sufficient of his general character. Bankers and big business men do not ordinarily associate themselves in business deals with such men. The shady character of the December, 1914, agreement, the Sprague people's flat repudiation of their obligations thereunder, Johnston's acquiescence in their conduct, the origin and history of the May 12, 1915, contract and the plain and apparently studied and intentional disregard of its provisions which were ostensibly for Garlick's benefit, the manner in which the affairs of the Lake Shore Company were conducted, and the procedure finally adopted and carried out for the purpose of eliminating the Garlick interests from that company and procuring the timber without substantial compensation (all of which appear from a careful examination and analysis of the evidence), to my mind clearly show that these parties set about, under a secret understanding or agreement, to get this timber for much less than they knew it to be worth through deceit and overreaching the Garlicks. Their conduct throughout this deal does not square with any other hypothesis. We may concede that the Sprague people thought they were acting within their legal rights, but that does not excuse their conduct. They had a right to procure the timber as cheaply as they could, or without compensation, for that matter, provided they used no unlawful or wrongful means to that end; but when one aids or assists in procuring the appointment of one secretly under his pay or influence as the agent of another, or secretly corrupts the agent of another and then profits, as a result thereof, at the expense of

the unsuspecting principal, he violates the law as well as business morals, whether he thought he had a legal right to do such things or not.   *   *   *

"Statu Quo.

"The law did not require plaintiff, before commencing this suit, to actually tender back the stock issued to Garlick and sufficient money to reimburse the Lake Shore Company for the money it paid out for taxes, interest, etc.    The stock in question was never in the hands of deceased or plaintiff.    It was admitted on the argument to be worthless in case the deed of September 4, 1915, was set aside.    It is in the hands of the trust company, where defendants put it.    Plaintiff, through defendants' fault, is in such financial straits as to be unable to either raise the money or redeem the stock which defendants demand she should produce.    To compel her to do this before she could bring suit would, under the circumstances, permit defendants to take advantage of their own wrong and require her to perform the impossible. This equity or justice does not require.    6 Cyc. p. 313.    She made a formal offer to return it in her notice of rescission of November 22, 1918, and she offers to do equity in her bill.    The rights of defendants can be protected by the decree.    The evidence in this case brings it within *Wright* v. *Dickinson*, 67 Mich. 580, 589, 590 (11 Am. St. Rep. 602) ; *Barron* v. *Myers*, 146 Mich. 510; *Ludington* v. *Patton*, 111 Wis. 245 (86 N. W. 571) ; *Thackrah* v. *Haas*, 119 U. S. 499 (7 Sup. Ct. 311) ; *Moffitt* v. *Shields*, 67 Mich. 610 ; *Jandorf* v. *Patterson*, 90 Mich. 40.

"A learned discussion of this subject appears in the *Ludington Case*, 111 Wis. 245-248.

"Ratification by Acceptance of Proceeds of Sale.

"Defendants' counsel argue that Johnston was Garlick's agent and that Garlick ratified his acts by acceptance of the proceeds of the sale.    This contention has already been sufficiently answered.    While Johnston assumed to act as Garlick's agent, he was the secret agent of defendants.    He was under their influence and pay.    They were colluding with him to overreach Garlick.    They were also occupying fiduciary relations towards Garlick when the acts complained of took place.    See *McCulley* v. *Rivers, Pearce*

v. *Ware, Torrey* v. *Cement Co., Macey Co.* v. *Macey, Pikes Peak Co.* v. *Pfuntner, Brigham* v. *Investment Co., supra;* also, *Roberts* v. *Sholes,* 144 Mich. 215; *Nichols* v. *Buell,* 157 Mich. 609.    *    *    *

"Minutes of Meeting of August 18, 1915.

"There were introduced in evidence certain documents which purport to be an incomplete copy of the minutes of a stockholders' and directors' meeting of the Lake Shore Company, purporting to have been held on August 18, 1915.    Defendants' counsel now argue that Garlick's rights were affected in certain respects by what occurred at that meeting; that is, they contend that Garlick, through Johnston, at that meeting offered his timber for $75,000 in stock and the company accepted the offer and a sale resulted, and that plaintiff cannot now complain that the timber was underestimated.    I cannot agree with counsel.

"The copies of minutes, if they show anything, show nothing more than that an elaborate set of minutes were drawn up beforehand to be used on that day (probably for the purpose of endeavoring to effect the result which counsel now claim came about) but for some reason were not used.    I cannot find that there were any stockholders of the Lake Shore Company until after the Garlick, Sprague and Johnston stock was issued.    How could a stockholders' or directors' meeting be held until there were some stockholders to hold it?

"Right of Majority Stockholders to Sell Corporate
Assets.

"It is not questioned that a majority of the stockholders of the Lake Shore Company had a right to sell the corporate assets provided that in doing so they acted honestly and in good faith.    The court does not intend, and does not understand that plaintiff is now seeking, in this case to set aside the sale made to defendant Lamoreaux or to interfere with the internal affairs of a Wisconsin corporation.    I am satisfied from the evidence that the sale made to defendant Lamoreaux was not made in good faith, but that it was made against the interests of the corporation and as part of a plan to eliminate the Garlick interests from the corporation and deprive them of their interest in the Garlick timber; but I have con-

sidered it only so far as it has a bearing on the questions of fraud and conspiracy raised by the pleadings in this case.

"Method of Determining Amount of Timber.

"Defendants contend that the court, in determining the amount of timber on the Garlick tract, must take into consideration the purpose for which it was purchased and the use to which it was to be put. What I have already said partially covers this question. The court cannot accept Sprague's testimony that maple was not merchantable. His testimony shows that the intention was to scow the timber to Washburn, not to raft it. Every cruise referred to in the record (even the old ones) puts this timber at over 26,500,000 feet. The articles of association of the Lake Shore Company state the business and purpose of the company to be 'the logging, lumbering, cutting and marketing of wood, timber and similar stock, in whatever form,' etc. The contract of May 12, 1915, required the 'total amount of merchantable log timber' on the land to be cruised and determined; it required the Garlicks to convey, and the deed of September 4, 1915 (which was drawn by defendants' counsel) did convey 'all the wood and timber now growing, standing or fallen' on the land. The list of this property given by defendant Lamoreaux to Landeck included not only maple, but also windfalls, dry hemlock, cedar poles, hemlock ties, cedar ties and box timber. The apparent purpose was not to limit the new company to the restricted business carried on by the Sprague Company; and even the Sprague Company cut some maple. The Garlick timber was carried on the Lake Shore Company's books at over 35,000,000 feet. There is nothing in the record to show that in May, 1915 (when this contract was signed), a 'depressed condition of the market' existed. Sprague's statements to Garlick in his letter of February 22, 1915, to the effect that people were not buying timber and that things were in a depressed condition, do not impress me. Aside from the fact that the Sprague Company never was successful in business, it was to his personal interest, and apparently in accordance with defendants' line of procedure in this deal, to make just such statements. In his letter of February 6, 1915, he had to admit that

'there is at this time a trace of improvement with the indication of much better business conditions,' and Garlick in his letter of March 3, 1915, mentions 'returning prosperity the country over.' This was two months before the contract was signed and six months before the stock was issued. This case does not fall within *Loud Lumber Co. v. Sterling, etc., Lumber Co.*, 203 Mich. 119. If there can be said to have been a construction put upon the contract by the parties, it favors plaintiff's rather than defendants' contentions. The forest products other than 'merchantable log timber' covered and conveyed by the contract of May 12, 1915, and the deed of September 4, 1915, might well be nearly equal in value to the amount of stock required by the contract to be issued to Garlick on the basis of the merchantable log timber on the land. I cannot, in any way I view the evidence, see any reasonable excuse for the gross underestimate of the Garlick timber on the basis of which stock was issued to him.    *    *    *

"Burden of Proof.

"Defendants contend that the burden is upon plaintiff 'to establish fraud so clearly as to leave no substantial doubt.' I have hereinbefore pointed out the rule applicable in cases where fiduciary relations exist, and will only add that even if the rule mentioned by counsel were applicable, the court would be bound to say that plaintiff has sustained that burden.    *    *    *

"Conclusion.

"Defendants' counsel inquire how the court is going to place the trust company, the stockholders of the Lake Shore Company, the creditors of the Lake Shore Company, the stockholders of such creditors, and the indorsers on the $40,000 notes, *in statu quo*. The court is not going to disturb any of these. The trust company remains just where it was when this suit was commenced. The mortgage is undisturbed and the indorsers have exactly the same security which they had before. The stockholders, of course, in no event would be entitled to any relief in such a suit as this. The Lake Shore Company stockholders, however, except Lamoreaux, by their conduct at the meeting of November 22, 1918, put it out of their power to reach this timber and rendered their stock utterly

valueless.    If any of them did not, they have their right to redress against those who are responsible for the present situation; but in any event it is not incumbent on plaintiff to reimburse them.

"A decree will be entered rescinding and canceling the contract of May 12, 1915; setting aside the deed of September 4, 1915; ordering an accounting between the plaintiff and defendants Lake Shore Company and M. S. Lamoreaux to determine the amount of money paid by the Lake Shore Company for principal and interest on the $40,000 notes and mortgage, for the satisfaction of taxes or tax liens upon the lands in question, and for the construction of permanent logging roads which have been constructed in and through the Garlick lands and can and will be used to remove the Garlick timber; and to determine the amount and value of timber cut from the Garlick lands by the defendants and the amount of money coming to its hands through said Garlick $40,000 loan; and decreeing the defendant Lake Shore Company to have a lien on said land, subject to said mortgage, for any and all sums which may be finally found due them on such accounting.    Said decree will reserve to the court the right to determine the amounts to be credited and charged to the parties, respectively, on such accounting, and the time or times for the payment of the balance or balances found due and payable; and plaintiff will be decreed, as a condition to the relief herein granted, to secure the release of defendants and their colleagues from liability on the $40,000 notes and to secure and deliver to defendant Lake Shore Company the stock heretofore issued to Wilmot H. Garlick and deposited with said trust company, within a certain time to be fixed by the court at the time of the settlement of the original decree."

Attention might be called with profit to one or two things shown by the report of Barrow, Wade, Gutherie & Company, expert accountants, who examined the affairs of the Lake Shore Company.    This report shows that on October 31, 1918, about a month before the sale to Lamoreaux, the total assets of the Lake Shore Company were $360,641.52; that the quick

assets of the Lake Shore Company inventoried at cost of production amounted to $102,095.96.   On the same date, the bills and accounts payable after deducting the bills and accounts receivable were about $116,000. The quick assets at a fair valuation would have taken care of the indebtedness of the company on the day of the sale.   After the sale Sprague continued to manage the assets and at once commenced to dispose of the quick assets.   So rapidly did he do this that Lamoreaux had to furnish only $20,000 new money to pay his bid of $100,000 for the total assets of the company.   If Sprague was able to do this for Lamoreaux there appears to be no good reason why he could not have done the same thing for the Lake Shore Company.   If he had the Lake Shore Company would still have the balance of the assets.   This management upon the part of Sprague clearly shows that he was recreant to his trust as president and manager of the Lake Shore Company, and that he did not desire to have it succeed financially.

We have read the testimony in this case with considerable care.   We have examined the briefs of counsel and the able analysis of the testimony by the chancellor.   After doing so, we are fully in accord with the conclusions reached by the chancellor and his opinion will be adopted as the opinion in the case in this court.

The decree will be affirmed, with costs of both courts to plaintiff.

FELLOWS, C. J., and WIEST, CLARK, SHARPE, MOORE, and STEERE, JJ., concurred.

The late Justice STONE took no part in this decision.